(122 So. 416)

## WATKINS v. POTTS. (8 Div. 28.)

Supreme Court of Alabama. March 28, 1929.

Rehearing Denied May 30, 1929.

Fred Wall and Thos. C. Pettus, both of Athens, for appellee.

Lynne & Patton, of Athens, for appellant.

THOMAS, J. The assignments of error are considered in the order urged. The suit was by the father for the death of his infant child. Alabama Power Co. v. Stogner, 208 Ala. 666, 95 So. 151. The proper pleadings in such case and the question of proximate cause have often been considered by this court, and should not be unnecessarily repeated. There was no error in giving defendant's charge 1. Morgan Hill Paving Co. v. Fonville (Ala. Sup.) 119 So. 610;[1] Armstrong v. Montgomery Street Ry. Co., 123 Ala. 233, 26 So. 349; Peck v. Henderson (Ala. Sup.) 118 So. 262;[2] Western Ry. v. Mutch, 97 Ala. 194, 11 So. 894, 21 L. R. A. 316, 38 Am. St. Rep. 179.

The suit grows out of the filling of a prescription by the defendant for plaintiff's baby; it being alleged that defendant furnished poisonous medicine, or delivered the wrong or deleterious medicine for said baby instead of that prescribed. The attending physician, when said baby was born, was the physician who wrote the prescription and delivered it to defendant, according to the undisputed evidence, on Saturday, and the same was not called for until some time Sunday following. According to the testimony of defendant, plaintiff's baby's prescription and that for another were delivered by the physician to the druggist to be filled, and this was done between 11 and 12 o'clock a. m. on Saturday, December 24, 1927, and they were not called for until after the following day. They were delivered to the father of the deceased child, the one for the child and the other to be delivered by the father to an adult in his neighborhood.

The baby of plaintiff was not strong; its skin was blue at birth, and was a sickly child. These were the general statements made by the attending physician of its physical condition, and that the prescription he gave the child called for a sedative to produce sleep. According to the testimony of all the physicians (Mayhall, Hagan, Pettus, and Powers), morphine acetate, which was given the child, would prevent rather than cause convulsions; that the medicine administered was a sedative and would produce sleep. The prescription of Dr. Mayhall was for a sedative to produce sleep, and the child's death was accompanied with or immediately preceded its end by convulsions. All the doctors who testified expressed their opinions that cheracol (the medicine administered) would not have produced convulsions and the subsequent death of the child.

All the testimony shows that the child died of convulsions—that is to say, the medicine prescribed by the child's physician was not to prevent convulsions, but was a sedative to produce sleep; that the medicine actually administered to the child by its parents was a sedative, would produce sleep, and tend to prevent convulsions. Thus the jury may find from reasonable tendencies of the evidence that whether or not Dr. Mayhall intended to prescribe cheracol, the effect upon the child was the same; the medicine was only a sedative, would not produce convulsions or spasms, would relax and give the child rest or sleep, the result being the same from the administration of either remedy, except there was a tendency of the evidence that the medicine actually given the child would tend to prevent convulsions, a decided symptom attending its death.

One of the physicians further testified that an overdose of cheracol, the medicine complained of as being administered, would have the effect of an emetic and thus free the stomach of the child of such dose. The evidence fails to show that emesis resulted; hence this was the basis of an inference that may be drawn that no such overdose was given.

The undisputed evidence showed that the prescriptions were properly filled and delivered, as requested, to the parent, but the wrong bottle was represented to said Watkins to be that of his child. The prescriptions on the bottles—that for the Watkins baby and the other person, delivered together to said Potts—are meager as to the person for whom they were intended; they were in accord with the prescriptions. Prescription No. 32062 did not carry the name of any person; it was for the adult. Prescription No. 32064 had only the name "baby" written on it; hence the confusion or lack of direction or misdirection or cause of mistake. The prescriptions were properly filled and labeled by the druggist. The question of negligence vel non in the premises, on the part of the druggist was properly submitted to the jury under the conflicting tendencies of the evidence. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135. The verdict of the jury will not be set aside unless palpably erroneous, wrong, or unjust. Jena Lumber Co. v. Marlowe Lumber Co., 208 Ala. 385, 94 So. 492; Mann v. Butcher, 211 Ala. 669, 101 So. 595; Central I. & C. Co. v. Wright, 212 Ala. 130, 101 So. 824.

Refusal of charges substantially covered by other given charges (as 1 and 3 covered by 4 and 8) was not reversible error (section 9509, Code; Rule 45; Corona Coal Co. v. Sexton, 21 Ala. App. 51, 105 So. 716); and so of refused charges invading the province of

[1] 218 Ala. 566.
[2] 218 Ala. 233.

the jury (McMillan v. Aiken, 205 Ala. 35, 88 So. 135; Bynum Bros. v. State, 216 Ala. 102, 112 So. 348).

Refused charges 2 and 5 were justified in their refusal by the use of improper words, respectively, as "delecterious" for "deleterious" and "durg" for "drug."

Refused charge C (6) was misleading when considered with all the evidence and its respective tendencies. The plaintiff was requested to be "furnished," by the druggist, with the two prescriptions; they were, respectively, properly compounded and labeled and delivered by the latter to plaintiff. The charge invades the province of the jury, and there was no error in its refusal. The prescription for the child was properly labeled with the direction placed on the bottle by the druggist. And there was no reversible error in declining the affirmative instruction that "the defendant was guilty of negligence *in furnishing the wrong medicine* to plaintiff." Ala. Great Sou. Ry. Co. v. Grauer, 212 Ala. 197, 102 So. 125; Bynum Bros. v. State, supra.

Refused charge D was substantially covered by given charges B and 4 and the oral charge of the court. Moreover the counts of the complaint use the words "poisonous or dangerous," and its refusal is justified in the use of the words "was not poisonous" under the issues of fact being tried; and instructions sought were contained and covered in given charge B.

In count 2, the plaintiff predicates negligence in failing to (1) fill the prescription as prepared and filed by the attending physician; and in (2) the failure on the part of the defendant to duly deliver the proper medicine. All the evidence shows the prescription was properly filled, and there was a failure of proof as to this count. There was no reversible error in the oral charge as to this phase of the case, of which there was no proof.

The oral charge presented the issues of negligence vel non, delivery of a poisonous or dangerous drug to the child's father, which was administered to the child, and whether or not the death of the child was the concurrent or concurring proximate and efficient cause of the injury of which complaint is made. Morgan Hill Paving Co. v. Fonville (Ala. Sup.) 119 So. 610.[3] And the jury were properly instructed at the instance of plaintiff, in given charges 6, 4, and 8. And there was no prejudicial error in refusing charge D as to count 2.

The extracts from Steven's Modern Materia Medica Therapeutics and other recognized authorities, highly technical in nature, are not shown to be relevant to the concrete case. We have carefully considered the same as originally offered and as later separately and severally offered in evidence, and find that no reversible error was committed in excluding the evidence from Steven's work. The cases dealing with evidentiary value of medical authors whose books are recognized and approved as standards in that profession or a branch of science, are well understood, and such books are admissible in evidence if applicable to the facts. Stoudenmire v. Williamson, 29 Ala. 558; Bales v. State, 63 Ala. 30; Russell v. State, 201 Ala. 572, 78 So. 916; B. R. L. & P. Co. v. Moore, 148 Ala. 115, 42 So. 1024; Gorman-Gammil Drug Co. v. Watkins, 185 Ala. 653, 64 So. 350; Barfield v. South Highlands Inf., 191 Ala. 553, 68 So. 30, Ann. Cas. 1916E, 1097. The extracts from Medical Jurisprudence by Dr. Taylor touch upon the subject of death as the result of poisonous drugs. One case involved the death of a child nine months old, caused by four drops of laudanum, equal to one-fifth part of a grain of opium, and stated that the child "was much convulsed before death"; another case wherein an infant five days old died in eighteen hours from the "effect of a twentieth part of a grain of opium"; and a case of morphine poisoning where the "patient died of convulsions in three quarters of an hour." Such illustrations would have been in the nature of a rebuttal, had it been clearly indicated, as does the undisputed evidence here, that the several foregoing results were from the taking of one thirty-second grain of morphine acetate. However, as the foregoing illustrations are stated, there was no error in excluding from the evidence said extracts from Dr. Taylor's Medical Jurisprudence.

The witness Hadden, a pharmacist, not a physician, was permitted to state that "a teaspoonful contains sixty drops; in a teaspoonful of cheracol there is $\frac{1}{32}$ of a grain of morphine acetate." He testified: "Morphine acetate is considered an active poison; the age and sex of a patient modifies the action of opiates on the system, and children are more susceptible to opiates than older people." He was permitted to be asked the question: "I will ask you if you know what is a dangerous dose of morphine acetate to be administered to a child three to four weeks of age?" To which he answered: "Cheracol contains $\frac{1}{32}$ of a grain of morphine acetate in a teaspoonful; a teaspoonful would be considered a little more than a maximum dose for a child three or four weeks of age."

We find no error in his examination as a witness.

The judgment is affirmed.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.

[3] 218 Ala. 566.