188 So. 264

**CITY OF DOTHAN v. HARDY.**

4 Div. 66.

Supreme Court of Alabama.

April 20, 1939.

T. E. Buntin, of Dothan, for appellant.

Martin & Jackson, of Dothan, for appellee.

BOULDIN, Justice.

Action against municipality under the Homicide Act. The death of plaintiff's intestate is alleged to have resulted from the negligence of appellant in operating a public utility, an electric light and power plant. This is the second appeal. For former decision, see Hardy v. City of Dothan, 234 Ala. 664, 176 So. 449.

Admittedly, J. L. Hardy, plaintiff's intestate, came to his death from contact with wires charged with electric energy of 2,300 volts. Three wires were strung low over the roof of a gin shed, entering the gin house a foot or two above the roof of the shed. Mr. Hardy was engaged, under orders of his employer, the operator of the gin, in repairing the roof of the gin shed. The gravamen of the complaint is that the City of Dothan negligently created or cooperated in creating a dangerous condition in the place of work, which proximately caused the death of the workman.

The plaintiff offered, and the trial court admitted in evidence, over objection of defendant, Section 23 of "Safety Rules for the Installation and Maintenance of Electrical Supply and Communication Lines," appearing in "Handbook of The Bureau of Standards, No. 10." This section, by "Table 4—Clearance of Supply Conductors from Buildings," prescribes vertical clearance of 8 feet above the roof for unguarded electric wires with a voltage of 300 to 7500.

Appellant assigns for error the ruling of the court admitting this evidence.

In Layne v. Louisiana Power & Light Co., 161 So. 29, a case quite analogous to this in several aspects, the Louisiana Court of Appeals, Second Circuit, considered this same rule of the "National Safety Code, prescribed by the Bureau of Standards of the United States Government." Its admissibility seems not to have been questioned, and the court appears to treat it as an authoritative rule, whose violation is negligence.

But in Mississippi Power & Light Co. v. Whitescarver et al., 68 F.2d 928, the United States Court of Appeals of Fifth Circuit takes a different view, and holds the refusal to admit such rules free from error.

The court points out that the U. S. Bureau of Standards of the Department of Commerce is created, its functions and powers defined, by Acts of Congress, 15 U.S.C.A. §§ 271–281; that these statutes confer no power on the Bureau of Standards to regulate the placing of electric

wires; and these published bulletins, known as "National Electric Safety Code," are issued pursuant to 15 U.S.C.A. § 274, as "information of value to the public."

We concur in the view that such rules are not regulations having the force of law, whose violation is negligence per se.

Does it follow they are not admissible as expert opinion evidence promulgated with government sanction in aid of those engaged in the employment of dangerous agencies to the end that public safety may be promoted, and the hazards incident to present day activities minimized?

The Court of Appeals, as disclosed by the opinion in above cited case, treats these publications as of the same class as medical works and other scientific writings shown to be authority on the subject, and rejects same on the grounds upon which such authorities are rejected under the rule said to prevail "elsewhere generally except in Alabama."

The Alabama Rule dates back to Stoudenmeier v. Williamson, 29 Ala. 558, opinion by Justice Stone. After reviewing authorities, the decision proceeds:

"We think that medical authors, whose books are admitted or proven to be standard works with that profession, ought to be received in evidence. Should such works be obscure to the uninitiated, or should they contain technicalities, or phrases not understood by the common public, proper explanation should be offered, lest the jury be thereby misled. That was done in this case. The opinions of physicians, as experts, touching disease and the science of medicine, are, under all the authorities, admissible in evidence. If we lay down a rule which will exclude from the jury all evidence on questions of science and art, except to the extent that the witness has himself discovered or demonstrated the correctness of what he testifies to, we certainly restrict the inquiry to very narrow limits. The brief period of human life will not allow one man, from actual observation and experience, to acquire a complete knowledge of the human system, and its diseases. Professional knowledge is, in a great degree, derived from the books of the particular profession. In every step the practitioner takes, he is, perhaps, somewhat guided by the opinions of his predecessors. His own scientific knowledge is, from the necessities of the case, materially formed and moulded by the experience and learning of others. Indeed,

much of the knowledge we have upon all subjects, except objects of sense, is derived from books and our associations with men.

"It is the boast of this age of advancing civilization, that, aided and facilitated by the printer's art, the collected learning of past ages has been transmitted to us. Shall we withhold the benefits of this heritage from the contests of the courtroom? We think not. Evidence drawn from this source being admissible, the question arises, in what form is it to be laid before the jury? Are opinions, derived from the perusal of books, and deposed to by witnesses, safer guides for that body than the books themselves are?"

Adverting by way of illustration to the science of law, he observes that the courts look to the evidence of reported cases and standard elementary writers, and concludes: "Under our system, questions of law are exclusively for the court, and with them the jury have nothing to do. All inquiries respecting any other science are questions of fact, for decision by the jury. Can that be a sound rule, which, in the determination of a question involved in one science, allows to the trying body the light shed upon it by the writings of its standard authors, and withholds such lights from controversies respecting all other sciences? We think not.—See Attorney-General v. Glass Plate Company [1 Anstr. 39] supra; also, Inge v. Murphy, 10 Ala. [885] 897."

This case has been followed throughout our jurisprudence. Merkle v. State, 37 Ala. 139; Bales v. State, 63 Ala. 30; Oakley v. State, 135 Ala. 29, 33 So. 693; Birmingham Ry., Light & Power Co. v. Moore, Ella, 148 Ala. 115, 42 So. 1024; Barfield v. South Highlands Infirmary, 191 Ala. 553, 68 So. 30, Ann.Cas.1916C, 1097; Anderson v. State, 209 Ala. 36, 95 So. 171; Carraway v. Graham, 218 Ala. 453, 118 So. 807; Batson et al. v. Batson et al., 217 Ala. 450, 117 So. 10; Watkins v. Potts, 219 Ala. 427, 122 So. 416, 65 A.L.R. 1097.

Our cases have dealt generally with medical authorities, but not exclusively so. Adler v. State, 55 Ala. 16.

In Alabama Power Co. v. McIntosh, 219 Ala. 546, 550, 122 So. 677, "The National Underwriters Electrical Code," inaccurately called the "National Electrical Code," was on proof that it was the standard used by all competent wiremen, held to be evidence of negligence in installing interior floor fixtures of a type forbidden by such Code.

The reasons behind the rule laid down by Justice Stone are not peculiar to works on medical science. If it be said, the science of electricity is not an exact science, that it is a growing science wherein former views may become obsolete, what is to be said of medical science, dealing with problems physical and mental? .

It is quite true the Alabama rule is at variance with the rule generally, if not universally prevailing elsewhere. Probably no better statement is to be found of the reasons behind the rule rejecting scientific treatises, including medical works, than in the text of Ruling Case Law, Evidence, Vol. 10, § 364.

■ That such statements are not sworn to is met under our rule by sworn evidence of an expert witness that such treatise is esteemed by the professions as good authority on the subject. ˙A perusal of the cases discloses the courts have much infringed upon and complicated the rule of rejection when confronted with its application. Our statute, Code, § 7720, is a statutory approval of this rule. See, also, Harris v. Nashville C. & St. Louis R. Co., 153 Ala. 139, 44 So. 962, 14 L.R.A.,N.S., 261.

We have not found the ends of justice defeated by our rule, nor the difficulties of its applications very great. So, accepting the view of Court of Appeals in the Mississippi Power & Light case, supra, to the effect that the National Safety Code is treated as other scientific works, we see no good reason to abandon the Alabama rule in that regard.

To our thinking there are stronger reasons for admitting the rules promulgated in this way than for admitting the ordinary treatise on evidence that it is a standard authority. A government bureau is set up with full authority to make full inquiry, to acquire information from all and every source, including the practical experience of those engaged in the particular line of ·business everywhere, to make an official finding of the standards proper to be observed, and to make an official publication thereof as information to the public. That this agency invites scrutiny and criticism rather strengthens than weakens its findings.

Now, if such rule be no evidence of improper installation, it could be no evidence of proper installation. The rule of exclusion must operate both ways.

If then, a municipality, or a utility company, accepts these safety standards, installs its lines in conformity thereto, the rule of exclusion would say to such utility these rules are no evidence of proper installation on your part.

Here, then, we have one agency of government giving information how to do it, and another department of government saying such information has no probative force as evidence. Government should not be thus at cross-purposes. Our conclusion is there was no error in admitting the safety rule in question.

The evidence of negligence on the part of the City ·of Dothan and of contributory negligence on the part of plaintiff's intestate was not materially different from that reviewed on former appeal. We adhere to the view then expressed that neither of the defendants was entitled to an affirmative charge with hypothesis.

That these high voltage wires, without adequate insulation, were strung so close to the roof as to greatly endanger a workman in doing the work he was sent there to do, was clearly proven. The evidence fully sustained a finding that the City owned or controlled the location of these wires, and that its servants, acting within the line of employment, had knowledge of these conditions.

Plaintiff's intestate, a laborer with no special knowledge of the dangers incident to his position was sent by his employer with material and tools to place and nail down metal strips as a ridge-roll on the roof. ·This necessitated working in a cramped position in very close proximity to these deadly wires. The evidence of Mr. Vann, the only one with him on the roof, tends to show that while trying to nail down a piece of ridge-roll, his hammer came in contact with one of these wires, producing a sudden loud explosion and blinding flash. When Vann recovered his vision after this flash, the body of plaintiff's intestate was lying on one of these wires.

Granting that Vann, subforeman at the moment, had warned deceased to be careful not to touch one of these wires with the metal they were handling, and not to permit his clothing, damp with perspiration, to come in contact therewith, it would not follow that plaintiff's intestate was guilty of contributory negligence as matter of law.

It does not appear either of these men anticipated what did happen. Vann says he advised plaintiff's intestate to leave the piece of roof-roll unnailed at that point because of the imminent danger. Deceased, expressing the belief he could nail it, proceeded with the attempt. It does not appear that Vann was giving orders as a foreman, or protested against his making the attempt. As stated in former opinion, there was conflict as to whether the head foreman, who ordered them to do the work, gave any warning instructions.

When one without special knowledge of all the elements of danger is sent to do a job inherently dangerous, he should not be merely warned of danger, but should be instructed in all the elements of danger. He is not to be charged with contributory negligence, if he is exercising reasonable care so far as things appear to him. He must appreciate, or be derelict in not appreciating, the dangers incident to the situation, and act in disregard of his own safety. In such cases the question of contributory negligence is generally one for the jury, rarely one of law. Curtis, Law of Electricity, §§ 510, 515, 525, 573; 20 R.C.L. p. 111, § 97; Johnson v. Alabama Power Co., 230 Ala. 91, 159 So. 695; Hardy v. City of Dothan, supra; Byars et al. v. Alabama Power Co., 233 Ala. 533, 538, 172 So. 621, and cases there cited.

The refusal of defendant's charge "b" was free from error. It predicates a verdict for defendant on the fact that plaintiff's intestate "contributed to or in his death in any degree." It is omissive in failing to predicate negligence as a proximate contributing cause.

Without considering whether Section 2030 of the Code of 1923 is applicable to this action, defendant's charge "y" was refused without error. Although another person may be charged with negligence concurring with that of the municipality if the evidence does not support the charge against such other person, this would not call for a verdict for the municipality, if a case against it was made out. The refusal of the charge here would be harmless, in any event, since the jury did render a verdict against both defendants for the same amount.

Appellant strongly insists there was error in overruling a motion for new trial on the ground that the verdict of the jury was a "quotient" verdict.

Scraps of paper were found in the jury room which when pieced together showed 12 sums footed up, divided by 12, giving a quotient of $6,708. The verdict was for $6,000. Data of this kind have been held prima facie sufficient to impeach the verdict as a quotient or gambling verdict. Southern Ry. Co. v. Williams, 113 Ala. 620, 21 So. 328.

We may remark that such inference would be weakened if the verdict was materially variant from the quotient thus obtained. A quotient verdict is a gambling verdict, one rendered pursuant to agreement, expressed or implied, to abide by the results; no juror knowing what verdict he is to render, each of the jurors being free to increase or decrease it by the figures he may name. Birmingham Railway, Light & Power Co. v. Moore, supra; Birmingham Railway, Light & Power Co. v. Clemons, 142 Ala. 160, 37 So. 925; George's Restaurant v. Dukes, 216 Ala. 239, 113 So. 53; Western Union Telegraph Co. v. Morrison, 15 Ala.App. 532, 74 So. 88.

While jurors are not permitted to impeach their own verdict, it is now well settled they may by affidavit disclose facts to sustain their verdict. Many affidavits, supplemental affidavits, and finally cross-examinations in person touching their affidavits were presented on the hearing.

We concur with the trial Judge in upholding the verdict.

The weight of the evidence discloses that during their deliberations, before any verdict was agreed upon, attention of the jurors was called to the fact that a lawful verdict could not be rendered through the quotient process, and then the papers were torn up, discarded, and deliberations continued for some hour or more seeking to reach an agreement on the amount, finally resulting in a unanimous agreement upon motion to fix the sum at $6,000.

The figuring, under this state of facts, amounted to no more than a tentative ascertainment of the views of the jurors, having no controlling influence thereafter, but leaving each of the jurors free to say what verdict he would approve.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.