104 So.2d 560

**Aaron Thomas WIGGINS**

v.

**STATE.**

4 Div. 358.

Court of Appeals of Alabama.

April 15, 1958.

Rehearing Denied May 13, 1958.

1. Ante, p. 431.

2. Ante, p. 432.

434

Prestwood & Prestwood, Andalusia, for appellant.

John Patterson, Atty Gen., and Geo. D. Mentz, Asst. Atty. Gen., for the State.

CATES, Judge.

Wiggins, indicted for assault with intent to murder Gladys Wiggins (who had divorced him absolutely), was tried April 22 and 23, 1957, and convicted thereof and sentenced to fifteen years' imprisonment.

Viewing the State's case in the light of the verdict, we find:

January 2, 1957, at about 8:20 P.M. Mrs. Wiggins was at home (in the Clearview section off the River Falls Highway in the environs of Andalusia) sewing and the children were watching television. Wiggins came to the house saying he wanted to talk to Mrs. Wiggins. Telling him she thought they had nothing worth talking about, she refused him admittance. Whereupon, he retired to his car parked in the driveway.

Next, she heard him approaching the door to the kitchen located on the "front side" of the house. He broke the hook on the screened porch door and finding the kitchen barred, he fired through it (the top half was glass) with a shot gun and hit Mrs. Wiggins in the side and in the arm. As she and her son ran out another door across the front lawn toward a neighbor's house, Wiggins fired at her twice, the first of these shots hitting her in the left hand and arm. Another shot hit her in the hips and legs—

"* * * I fell and he said he was going to get Linda. That is my daughter. So I started trying to get up. Well, I still did have the leg. He came on down there though where I was, and I don't remember the words he used, but I was begging him not to hit me any more, not to shoot me any more, and he hit me with the barrel of the gun, like he was standing and hit me on this side of my head, and he hit again then on this side, and I can remember very definitely that I was about to faint, and I said I can't because there wasn't anybody else with the children there. I kept begging him not to hit me any more. He said he was going to kill me, and he also said he was going to get my brother, he was going to kill him, and he led or drug me up to the car. The car was parked—I don't know the distance.

"The Court: Just go ahead and tell the best you can.

"A. The car was on the upper side of the yard and this was down on the lower side of the yard, and I don't

know how, just with him leading or dragging me by my arm, but he had me pinned between he and the car when the police got there. He had the gun drawn back and when the policeman got out of the car and came and flashed his light on him he turned me loose and he took the gun with both hands and drew it on the policeman, and he rasseled the gun from him. * * *"

There was evidence of his making prior threats against her life and limb.

Roger, age 10, and Linda, 13, children of Mrs. Wiggin's first marriage—she was the widow of defendant's cousin, Buck Wiggins—both gave testimony substantially corroborative of the foregoing account.

Wiggins entered a plea of not guilty and also one of not guilty by reason of insanity.

As to this latter plea, there was evidence tending to show (1) that Wiggins tried to drown himself by sticking his head in a plugged up commode in his cell at the Andalusia police station; (2) that the police found a capsule in the defendant's pocket; (3) that defendant had headaches, in fact he was complaining of one the afternoon of January 2, 1957; (4) that on that same afternoon Wiggins came to his parents' home complaining of headache and his father gave him a little bottle of tablets (later identified as "Doriden"), of which the defendant took two, and later his father found the bottle (which had first held some eight or ten tablets) empty; (5) that defendant also took two capsules of a painkiller ("Tuinal") prescribed for him by a physician when he had had a toe operation; (6) that defendant remembered nothing from the taking of these drugs until awakening in a hospital room after the attack; (7) that he was rejected by the Army because of a nervous condition; (8) that he had a blackout once when his wife told him of some undisclosed awful matter that put him in a state of shock; (9) that he told the Police Chief he thought

he was shooting his ex-brother-in-law; and other miscellaneous indicia from which abnormality could be inferred

The State's rebuttal evidence tended to demonstrate Wiggins's eccentricities came from drinking.

There is a threshold question which was presented by way of a motion for continuance and by a motion for the trial judge to recuse himself.

The motion for continuance filed April 22, 1957, prayed the court "to grant a continuance of the trial of this case until the fall term of Court, or at least until sufficient time has elapsed to permit the subsiding of the violent prejudice which the Court itself has heaped upon this Defendant."

The assigned grounds in support of this motion were (1) the trial judge's reading to the venire of the preceding week (April 15, 1957) of a prepared statement:

"Gentlemen of the Jury:

"The Court desires to make some statements and observations to you that concern one of the criminal cases set for trial this week. The case to which we have reference is that of the State vs A. T. Wiggins. At this juncture the case has not been called for trial.

"We prefer to be very careful and guarded in our remarks. For that reason and for the sake of accuracy we have reduced to writing our preliminary observations.

"A very respected citizen, a member of this jury, called me over the phone Saturday afternoon, while I was at my residence, and stated that he would like to see me. In due course we called at his place of business.

"This juror, whose name will be revealed to you in due time, told me that he had had a conversation from which he drew an inference that some

unconventional contacts with prospective jurors for this week were being made. In due time this witness will be permitted to verify his conversation. He told us that he had cause to believe some jurors might have been seen about the work of the court this week.

"We felt that we would not be committing judicial impropriety to pursue this matter further by contacting some of the jurors reasonably accessible for was reasonable foundation for this the purpose of ascertaining if there Court to believe that the jurors here this week might have been approached about any case set for trial this week.

"We were convinced after further investigation that an inquiry on the subject should be pursued in open Court today with the aid of the Circuit Solicitor and such others as may want to participate. We wish to ascertain by this inquiry whether or not other jurors have been contacted by overzealous persons interested in the outcome of the Wiggins case.

"It is therefore the purpose of this Court to give every juror present an opportunity to tell from the witness stand today, under oath, whether or not he has had an undesired and unwelcome visitor, who, by subtle or bold methods, sought to influence him or obtain his views on the case of the State vs. Wiggins. We want the inquiry open and we desire that each juror feel free to tell what he knows, if anything, on the subject of the inquiry.

"We wish to state here that in pursuing this inquiry, we do not suspect any juror of being bought or influenced. Also we want it clear to you and each of you that we do not suspect any juror or any dishonesty whatsoever if this case was mentioned to him by any unwelcome visitor. Nor do we want you to believe that you or any of you encouraged such a visit. But to the contrary, believing in your desire for justice and fairness as we do, we prefer to think that you resented the approach.

"We do believe though that such an undesired visit to you by any one interested in the result of this case, however subtle or faint the conversation might have been would place you in a very awkward and embarrassing position should you be called to sit in judgment on the guilt or innocence of the defendant, Mr. Wiggins. In fact, it might weigh against the side on behalf of whom the contact was made. You might unwittingly lean over backward the other way in a conscientious effort to avoid the intended effects of the visit.

"This Court would not prefer any juror to sit on a case unless he feels free and unrestricted in his efforts to write the truth in his verdict. Therefore, to avoid a trial under such restrictions or impediment, and without full freedom of judgment, we decided on the course that will be taken here today.

"This Court assures you that the questions which will be asked each of you when you take the stand are not intended to entangle you in the toils of the law. We do not wish to embarrass you. The Court so far as you are concerned wants to be enlightened as to whether or not there has been any unethical contacts with you by parties or persons unduly interested in the result of this case. We ask your full cooperation.

"We regret the circumstances are such that we feel judicially impelled to make this investigation. Justice and the freedom of our courts are paramount. We also wish to protect the jurors from undue approaches or influences. We regret the necessity of the inquiry, but circumstances and reports demand that we proceed."

(2) after reading the above statement the court questioned each member of the venire (except defendant's brother) as to whether or not "any unwelcomed visitor had discussed the case—five stated the case had been mentioned to them: one prospective juror testified two of Wiggins's brothers spoke to him of the case but that this did not influence him; (3) the trial judge allegedly "went beyond the call of duty and custom" in initiating a private investigation of this suspicion of jury tampering, in admonishing the venire of April 15 and in other divers acts, all claimed to be prejudicial to the defendant.

The venire of April 15, 1957, was discharged and all cases were continued one week, i. e., to April 22 when Wiggins was put to trial.

■ As a matter of strict logic, a motion for continuance should not lie on the ground of community prejudice; a motion for a change of venue is the proper expedient, Code 1940, T. 15, § 267. However, these motions seem sometimes to be treated alternatively. At any event, the appellant must make "a very strong showing" to put the trial court in error on a denial of a continuance or a change of venue, Clayton v. State, 244 Ala. 10, 13 So.2d 420, 421; Littlefield v. State, 36 Ala.App. 507, 63 So.2d 565.

■ On the evidence here to postpone the trial, we conclude the trial judge has not been shown to have abused his discretion. Wiggins himself is the first to say he does not condone jury tampering—so patently denounced by law and fair play. Thus, we cannot see how a trial judge doing his duty to investigate (Code 1940, T. 13, § 3) one week can influence jurors of the next week.

■ As to recusing himself, the court was not brought under the operation of Code 1940, T. 13, § 6. His interest in preventing tampering with persons called as jurors had the warrant of law. To avoid unduly lengthening this opinion, we refrain from moralizing on the need for jurors being unmolested and impartial.

■ Hence, we hold there was no error in putting Wiggins to trial. While the statute on recusal rests on kinship or pecuniary interest, the Attorney General quite properly concedes there are additional common law grounds supporting the need for a judge to be "indifferent" in all causes before him. State ex rel. Claunch v. Castleberry, 23 Ala. 85, and Gill v. State, 61 Ala. 169.

It is argued that a defendant who considers himself aggrieved by the failure of a trial judge to recuse himself for something that happened a full week beforehand may not sit back, speculate on the verdict and then, if a loser, press the question on a motion for a new trial or appeal. The State says his remedy was by way of mandamus, so that a substitute judge could be seasonably sent to take over; that the motion to recuse must be promptly made—not as here on the day of the docket being called. Lindsey v. Lindsey, 229 Ala. 578, 158 So. 522, implies that mandamus is ordinarily the exclusive remedy to bring about a disqualification of a trial judge. Where, as here, the alleged bias arose seven days before trial, the failure to ask a higher court to install a different judge can be argued to be invited error.

The editor, at 45 A.L.R.2d 939, succinctly puts the necessity for the rule:

"By way of comment, it may be suggested that since it is universally agreed that in the absence of a waiver of the disqualification, any judgment rendered by a disqualified judge is void,* and since the question of disqualification is a matter separable from the merits of the pending litigation, a judge's refusal to disqualify upon a timely application therefor should be subject to immediate review, either by appeal or by mandamus, so as to avoid

---

* Voidable in Alabama. See State ex rel. Burns v. Phillips, infra.

the expense and delay of what might prove to be a wholly abortive trial."

Moreover, as a matter of consistency it is said, how can Wiggins first claim the trial judge to be disqualified and then endure the judge's ruling and allow himself to be tried by a man he contends is unfair to him? See Gladstein v. McLaughlin, 9 Cir., 230 F.2d 762.

The failure (in the circumstances of this case) to apply for mandamus is contended to be an abandonment of the application that Judge Simmons recuse himself because of the enquiry conducted by him of conversations with members of the venire. Knight v. State, 143 Ga. 678, 85 S.E. 915. We read nothing in State ex rel. Burns v. Phillips, 250 Ala. 120, 33 So.2d 239, to contravene this view: in fact, we find much in Gulf States Steel Co. v. Christison, 228 Ala. 622, 154 So. 565, to confirm it. Ex parte Dew, 7 Ala.App. 437, 62 So. 261, merely holds mandamus must be seasonably sought.

Were we to consider the motion to recuse on its merits as though presented by mandamus, or properly reserved on appeal, we would decide there was no error in the judge not disqualifying himself. Hence, it is not necessary to decide that in circumstances such as these mandamus is the *exclusive* remedy.

In the examination of Dr. Ray Evers, a physician called by Wiggins, reference was made to a reprint of an article that appeared in the Southern Medical Association Journal written by three doctors of the Psychiatric Department of the Vanderbilt University Medical School. The article was entitled, "Acute Doredin Intoxication." On voir dire as to the scope of the article, Dr. Evers testified:

"A. This individual report, you see when any new drugs are discovered and tried, they are tried by various groups of doctors, and the drug had been accepted. But this is so unusual for a person to take an over dose of this particular drug until it was very desirable to have that report in medical literature. So this is a report, as definitely stated, of this one particular patient who took this over dose of this drug in order to commit suicide, but she didn't die from it; she slept twenty-three hours but didn't kill her, and so that's the purpose of this * * *

"The Court: In other words, this doctors' report is based upon this particular case. A. The individual case.

"Q. The individual case as appearing in this sheet? A. Yes, sir, that's right. But still that is to educate the rest of us as to what can happen from using the drug.

"Q. But it is based on the one report? A. On the one case, yes, sir. Now these remarks in the beginning and the end are general remarks that refer to any cases, but the discussion is of that one case. The fine print is one case but the other are general remarks and would apply to the use of the drug in any patient.

* * * * * *

"By Mr. Prestwood

"Q. Dr. Evers, that pamphlet that you have just been asked about, and you have testified about, refers to an over dosage of a certain drug called Doriden, is that right? A. That's right. That is a case report of that particular drug.

"Q. And the first part of that article is a general discussion, and in there is the case report built into it, isn't it? A. That's right.

"Mr. Prestwood: We reoffer it in its entirety, and if the Court will not permit it in its entirety we offer it less the case report.

"Mr. Brogden: We object.

"The Court: Now the Court sustains the objection because it appears from the case report that the particular patient was suffering with psychroneurosis, and there is no evidence that this

particular defendant is suffering from any psychroneurosis sofar as I know, and in view of that fact that this defendant has not brought himself within the terms—within the physical condition of this particular woman upon whom the report is made, we sustain the objection.

"Mr. Prestwood: We except to the Court's commentary and to the Court's ruling that this pamphlet and that no part of it is admissible. Is that right?

"The Court: Yes, sir. Now the Court is not making any comment on the evidence. The Court is stating that sofar as we know there has been no evidence of this defendant suffering from that particular disease as stated in that report.

"Mr. Prestwood: We except to the last statement of the Court.

"Q. With further regard to the drug Doriden which you prescribed for Mrs. Wiggins and about which you have given some testimony, you said that that was a comparatively new drug? A. That's right. Less than a year old.

"Q. Now due to the fact that it is a new drug, isn't it a practice in the medical profession to get clinical reports, assimulate them and evaluate them to determine the characteristics and reactions of any drug that is put on the market? A. That's true, yes, sir.

"Mr. Prestwood: Now you let the title of the pamphlet stay in?

"The Court: No, sir. I am ruling the whole thing out."

█ We find no error in the exclusion of the article since there was no imprimatur of Dr. Evers to the effect that the writing was of a substantially recognized theory such as might be found in a standard medical book. Stoudenmeier v. Williamson, 29 Ala. 558; City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 122 A.L.R. 637.

Dr. Evers was asked the two following hypothetical questions:

"Q. Can you tell us whether a person who had as many as ten of those pills in the green bottle up there, would after taking them be in a conscious frame of mind? Can you tell us that much.

"Mr. Boswell: We object.

"The Court: Sustain the objection.

"Mr. Prestwood: We except.

"Q. In your opinion, based on your medical education and your medical experience and your psychiatric experience, in your opinion, would a person who had taken as many, well, say eight or ten of the tablets, in the exhibit there in front of you, and two Tuinal capsules be in his conscious mind after so taking. * * *.

"Mr. Brogden: We object.

"Q. Let me finish. Would he be in a conscious state of mind after ingesting those number of tablets of those particular two kinds of drugs?

"Mr. Brogden: We object.

"The Court: Sustain the objection."

The fact that each question was hypothesized upon "a person" rather than upon Wiggins—if he knew the physical factors of Wiggins as to Doriden reactions—discloses at least one sufficient objection. "A person" in this context is synonymous with "any person." The hypothetical reaction should have been brought into a frame of reference embracing Wiggins.

█ The court also sustained objection to the third hypothetical question:

"Q. Now one final question. Assume that a person of Mr. Wiggins' age, general condition, the defendant in this case, took eight or more tablets —green Doriden tablets there for a headache, and also took two Tuinal capsules, trying to cure himself or rid himself from extreme headache; as-

suming that basic preface, what in your judgment and opinion would be the physiological and nervous or psychological reaction to the ingestion of those capsules under those circumstances by a person of Mr. Wiggins' age here and general condition."

■ There is the further principle that the frame and substance of hypothetical questions are largely committed to the trial judge's discretion, Sovereign Camp, W. O. W. v. Davis, 242 Ala. 235, 5 So.2d 480. Here we perceive no abuse of this discretion: in particular we note the defendant testified he only remembered taking four of the tablets. His father could only testify as to his taking two and later finding the bottle empty. Accordingly, the three foregoing questions can well be said to be without an evidentiary predicate.

In argument to the jury, the solicitor said:

"Gentlemen, this is one of the most worse cases that has ever come to the attention of a jury of Covington County since I have been solicitor. The brutality of the thing."

After objection was made, the trial judge said:

"I think he said it was one of the worst cases of brutality that has ever come to his attention since he has been solicitor. Or in substance that any way. Overrule it."

Wiggins argues that by failing to use the solicitor's exact words, the judge infused the proceeding with an independent version tantamount to a spontaneous comment of his own. Since we construe the solicitor's version to be more all-embracing (because not limited to brutality—at least in the beginning), the court's remark confining it to cases of brutality was within the boundaries of the solicitor's reference. Nor was the solicitor's remark harmful, Watson v. State, 266 Ala. 41, 93 So.2d 750.

We have, as required, reviewed the entire record and conclude the defendant had a fair trial below.

The judgment of the circuit court is

Affirmed.