Albert C. Washington was indicted by the Grand Jury for the first degree murder of Neal Haley by "shooting him with a pistol." Appellant plead not guilty and was tried by a jury. They found him guilty of murder in the second degree and sentence was fixed at thirty-eight years' imprisonment. Appellant gave oral notice of appeal and filed a motion for a new trial. This motion was denied, hence this appeal.
Tyrone Davis testified that he was charged with murder in the first degree for the same murder for which appellant was being tried in the instant case. Davis stated he had known appellant some thirteen years prior to August 30, 1977, the day the murder occurred. On that day, Davis had driven to appellant's residence in his 1975 dark brown Honda Civic, arriving at approximately 10:00 a.m. After visiting a lady friend at her home for an hour, the two men drove to the south side of Bessemer to the home of Andre Thomas in the South Bessemer Projects. Present at the home were Andre Thomas, Tyrone Davis, appellant and one James Johnson. During the course of conversation, Thomas suggested to the other three men that it would be a "good day" to rob Haley's Confectionary located on Dartmouth Avenue in the project area. Davis testified he told Thomas, "I say, you can go and do it yourself, I'm not going to participate in this." (R. 13-14) Appellant and Davis then left in Davis's Honda. At appellant's direction, Davis *Page 238 
drove appellant to Haley's Confectionary to buy a candy bar. Appellant purchased the candy, and the two men then returned to Thomas's residence, again at appellant's direction. When Davis asked appellant why he wanted to go back to Thomas's residence Davis stated appellant said, ". . . I want to go by there and see can I get me a gun. I think I'm going to go and try to take this place off." (R. 15) Davis told appellant he would take him to Thomas's house, but that if appellant was going to do that, he was on his own, and he would not be involved in it.
After returning to Thomas's residence, Davis sat in the automobile, while appellant and Andre Thomas talked. Appellant then got back in the vehicle, and asked Davis to drop him by Haley's store. Davis testified he told appellant, ". . . Well, Albert, when you get out of my car you are on your own. I'm going on about my business." Davis then dropped appellant off fifty feet from Haley's store, and drove away.
Six blocks from the store Davis parked his vehicle and began a conversation with an unknown man, who was washing his automobile. After about five minutes he noticed the man looked distracted by something, and he also looked and saw a man "with no shirt on" running down past the back of some apartments. At first the man was running away from Davis's vehicle. He then turned and ran toward Davis, who recognized the runner as the appellant. The record reflects the following:
 "Q Okay. After he got to your car, what if anything did he say to you?
 A `Let's go, man. Crank up. Come on, man, let's go. What's the problem?'
 I said, `What is the problem? What is the matter?' I said, `What are you in a hurry for.' He said, `just crank up the car, let's go. Don't even sit here and talk about it. Let's go.'
`Why, man?'
 `The man got stubborn on me and pulled a gun and I had to shoot him.'
Q Was anything else said by him at that time?
 A `I tell you what' — this is my answer. `I tell you what, if you done something like that, me and you are going to have to stay away from around each other. Because, if anybody seen you getting in my car they ain't going to be too interested in the man. They are going to be giving a description of the car they seen them leaving in.'
Q Was you in the same brown car?
A Yes, sir.
Q What kind of car was that?
A 1975 brown Honda Civic." (R. 21-22)
Davis then took appellant home, and returned to the project. Again he parked six blocks away and walked to Haley's store. He entered the store, and saw Mr. Haley lying on the floor with a hole in his head. Davis left the store and went home. Sometime in December, Davis accompanied Washington and another man to Cleveland, Ohio, where he remained for five months. Davis stated he did not know appellant was going to rob the store, and that having known appellant for a number of years, he did not believe appellant could even try to do such a thing.
James Johnson testified he went to Haley's store around 2:30 p.m. on August 30, 1977 to buy cigarettes. As he was leaving the store, he saw appellant, whom, he knew, get out of a small automobile and walk toward Haley's store. Johnson also observed the small car leave the scene. Johnson then went to a friend's house about a block away from the store, where he heard what sounded like a gunshot from the direction of the store. This took place some four to five minutes after he saw appellant headed toward Haley's store. Upon hearing sirens and seeing people run toward the store, Johnson also returned to the store. There he saw Mr. Haley lying on the floor with blood on his head. Johnson also stated the vehicle from which appellant disembarked was a Honda or Toyoto and was driven by Tyrone Davis.
Officer C.E. Pitts of the Bessemer Police Department testified he answered a call on August 30, 1977 in response to a reported shooting. An ambulance driver on the scene told Officer Pitts that the victim appeared to be dead. Pitts entered the store *Page 239 
and discovered Mr. Neal Haley, a fifty-nine year old man, lying on the floor face up. There was a small caliber gunshot wound in his forehead above his right eye. Pitts checked for pulse and respiration, found none, and then proceeded to secure and investigate the area.
Charles Robey, a Jefferson County Coroner-Medical Examiner, investigated the Haley homicide after a call on August 30, 1977. He found an elderly deceased black man with a single gunshot wound to the head above the right eye. An autopsy was later performed on Mr. Haley, at which Mr. Robey was present. Robey gave his opinion that Haley's death was caused by a gunshot wound to the head.
Sergeant Douglas Acker of the Bessemer Police Department testified he also investigated the Haley homicide and testified concerning pictures and a diagram he had made at the scene of the murder. He also stated the murder weapon had never been found.
Sergeant E.N. Franklin of the Bessemer Police Department testified he participated in the extradition of appellant from Louisiana in January of 1980. He, along with another officer, went to New Orleans, Louisiana to pick up appellant at the city jail and bring him back to Bessemer.
The State rested and appellant moved to exclude the State's evidence. Appellant also presented the court with a written request for the affirmative charge. The trial court denied appellant's motion and refused the charge.
The defense called the appellant, Albert C. Washington, to testify in his own behalf. Appellant testified he was in Orville, Dallas County, Alabama staying with relatives on August 30, 1977. He stated he did not shoot Mr. Haley and had never been inside Mr. Haley's store. Appellant stated he knew nothing of the murder or of his having been charged with it until January 1980. He stated he did not object to or contest his extradition as he had nothing to hide. Appellant presented no witnesses from Orville to verify his alibi of having been with relatives on the day the murder took place. Inez Washington, the appellant's mother, did testify her son spent some time during the summer months of 1977 with relatives in Dallas County, but she did not recall the specific dates. Following Mrs. Washington's testimony, the defense rested.
 I
Appellant argues that Tyrone Davis was an accomplice as a matter of law, and that as such, appellant would not be convicted for a felony unless Davis's testimony was corroborated by other evidence connecting him with the crime, citing § 12-21-222, Code of Alabama 1975. He asserts further that there was not sufficient evidence to corroborate the testimony of Tyrone Davis.
In order for a defendant to invoke the § 12-21-222
prohibition mandating corroboration of an accomplice's testimony, the evidence must present an undisputed question of fact for the trial judge that the witness giving the testimony is an accomplice. Yarber v. State, Ala., 375 So.2d 1229 (1978);Clifton v. State, Ala.Cr.App., 359 So.2d 853 (1978). The question of law for the court resolves itself into one of undisputed evidence. Leonard v. State, 43 Ala. App. 454,192 So.2d 461 (1966). Where there is doubt or dispute under the evidence as to whether a witness is an accomplice, a question of fact for the jury, not the trial court, is presented. Jacksv. State, Ala.Cr.App., 364 So.2d 397, cert. denied, Ala.,364 So.2d 406 (1978).
The mere fact that a witness is indicted for the same crime as the defendant does not per se raise a presumption that he was an accomplice. Jacks, supra. Here, as in Clifton, Yarber, and Jacks, supra, the witness denied his participation in the crime charged against the defendant. The witness never admitted any involvement in the crime. Hence, under the witness's testimony, the issue of whether the witness was an accomplice was a disputed fact for the jury, not the trial court. Yarber, supra. Because this issue remained a question for the jury, the denial of the appellant's motion to *Page 240 
exclude the State's evidence for insufficient corroboration was not error The jury was appropriately charged, the issue was placed fairly before them, and was determined adversely to appellant. Having determined that the issue of whether the witness was an accomplice presented a question of fact for the jury, we pretermit discussion of the sufficiency of the corroborative evidence.
 II
Appellant contends the verdict of the jury must be set aside as a quotient verdict. At appellant's motion for new trial it was stipulated that after the verdict was returned, defense counsel entered the jury room and found a sheet of paper. The sheet contained a column of numbers ranging from ten to 100 which had been totaled to reflect a sum of 455. This figure was then divided by twelve, giving the number thirty-eight. The jury fixed the appellant's punishment at thirty-eight years' imprisonment. Appellant contends this sheet of paper creates a fair inference that the verdict was a quotient verdict reached by previous agreement of the jury. As such, he contends it is not a true verdict and must be set aside.
The general rule is that where there are figures shown to have been used by the jury in its deliberation from which a fair inference may be drawn that the verdict was a quotient, the court will hold that it was a quotient verdict conditioned on a previous agreement, unless satisfactory countervailing evidence to the contrary is introduced by the State. Copelandv. State, 252 Ala. 399, 41 So.2d 390 (1949). This rule is founded upon the belief that "`Verdicts found by lot are the issue of ignorance, passion, or indifference to the rights of life, liberty, and property, and [show] an utter disregard for the rules of law and fair deductions that should be made from the evidence.'" (Citations omitted). Harris v. State, 241 Ala. 240, 2 So.2d 431 (1941). However, it must appear that the jury consciously adopted such a plan and in fact agreed in advance to be bound by the quotient figure. Therefore, the vitiating fact is the agreement in advance to be bound by the result.Copeland, supra.
 "So, if there be no previous agreement that the average estimate to be arrived at shall be binding and this plan of deliberating is adopted merely for the purpose of achieving a working basis, which the jurors are free to accept or reject as they see fit, a verdict to which the jurors subsequently agree is not regarded as a quotient one but is binding whether it is for a sum which is the average of the amounts fixed or for some other amount. Harris v. State, 241 Ala. 240, 2 So.2d 431; City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 268, 122 A.L.R. 637; Ewart v. Cunningham, [219 Ala. 399, 122 So. 359,] supra." Copeland, supra.
Lewis F. Patrick, the foreman of the jury, testified at the hearing on the motion for new trial as follows:
 "Q Now, if you would, tell us what procedure you and the other jurors used in determining the sentencing aspect of your decision?
 A Well, first it was unanimous that he was guilty. I was the foreman. So, I gave each juror a piece of paper and told them to put down the number of years that they thought he should serve.
 And they ranged anywhere from ten to one hundred. And while we were counting them up, I put each one down on a sheet of paper and added the total of them. And I divided that by twelve which came to 38.
 I said, this is not a unanimous decision. We have a difference of opinion here. But, the average is 38 years. Is there any deliberations here? (sic) Is there any questions or anything and naturally there were. I said —" (R. 133)
. . . .
 A "I asked each individual, not secretly, but around the table — we went around the table. I said, would everybody be in agreement with 38 since it is not a unanimous decision and each one said yes that was perfectly all right with them. That is what they would suggest. *Page 241 
 Q Let me ask you this, Mr. Patrick; did you have an agreement or was it the agreement of the jury to be bound by the outcome or your mathematics on this thing?
 A No, sir, I did not. There was no agreement whatsoever. The only time that they knew of the 38 was after I figured it up.
 They didn't even know what I was doing. There was no agreement whatsoever.
 Q And I believe you said there was some discussion after this occurred?
A Right.
 Q And do you recall after you handed your decision to the Judge, you being asked whether or not that verdict was your verdict?
A Right.
 Q And all of the jurors were asked that same question, were they not?
A Right.
 Q And to the best of your recollection, did everybody respond yes that was their verdict?
A Right." (R. 134)
After reviewing Mr. Patrick's testimony, we are of the opinion that there was no prior agreement among the jurors that a binding verdict was to be reached by the quotient formula. Rather, the method was used as a springboard for deliberation and discussion. The final verdict reached appears to have been the verdict of each and every individual juror. As such, the challenge to the jury's verdict is without merit. Copeland, supra. Storie v. State, Ala.Cr.App., 390 So.2d 1179, cert. denied Ala., 390 So.2d 1184 (1980).
No prejudicial error to the substantial rights of appellant having been found in our review, this case is affirmed.
AFFIRMED.
All the Judges concur.