282 So.2d 402

**Norman OWENS**

**v.**

**STATE.**

**8 Div. 314.**

Court of Criminal Appeals of Alabama.

June 12, 1973.

Rehearing Denied July 26, 1973.

William J. Baxley, Atty. Gen., Montgomery, James G. Lee, II, Sp. Asst. Atty. Gen., Tuscaloosa, for appellee.

Robert Straub and Ralph E. Slate, Decatur, for appellant.

HARRIS, Judge.

Appellant was convicted of burglary in the second degree and received a sentence of seven (7) years in the penitentiary.

On April 2, 1969, between 7:00 and 7:30 P.M., the Diamond Jewelry Company building located at 206 Johnston Street in downtown Decatur, Alabama, was broken into. Located next door to the jewelry store was Hines Barber Shop, owned and operated by Joe Hines. April 2, 1969, fell on a Wednesday when most of the stores and shops in Decatur closed at noon. Joe Hines testified that he closed his shop at 12:00 noon on that date, but that he returned to his shop that night in company with his mother for the purpose of cutting and washing her hair. He frequently did this on Wednesday nights. When Hines drove up in front of his shop on this particular night, he saw two men in front of the jewelry store. When he opened the door of his car to get out, he heard the burglar alarm system of the jewelry store go off. At this time, he saw only one man in front of the jewelry store and heard someone say, "let's go." He then saw a man come out of the jewelry store putting something in his pockets, join his compan-

ion, and observed both run by his car and on down the street. He had his pistol with him and gave chase. After running after them a short distance, he shouted, "halt" and fired his pistol one time in the air. Both men paused momentarily and one threw up his hands and then both men separated, one went down an alley and the other ran north toward Moulton Street, and Hines gave up the chase. He went to a nearby drugstore and had someone call the police, stating, "I was so give out, I couldn't call them." He testified that one man was six feet or more tall and weighed around 210 to 215 pounds and had a flat top type hair style. He described the other one as being about 5 feet 9 inches tall and weighing about 180 pounds and that his hair was longer on the sides and roughed up like a pompadour with a wave on top. He said they appeared to be well dressed, wearing coats and ties. He did not see anything in the hands of either.

The police operator put out an alert on the radio and a Decatur police officer, David Reed, was driving south on Sixth Avenue and turned onto Moulton Street when he picked up the dispatch on his car radio. The dispatch did not say whether the suspects were white or black, nor was there a further description of the men as to dress or appearance. As he turned on Moulton, he observed two colored men running across Highway 31 or Sixth Avenue, and go into a washette. He parked near a service station on Moulton Street to keep a look-out. This point was less than two blocks from the jewelry store. While parked he got a second communication on the radio from the Decatur Police Department giving a more specific description of the burglary suspects. He did not testify as to the more specific description of the suspects he allegedly received in the second communication over the police radio. About this time he heard someone shout, "hey" or something and immediately saw a man run in front of his car as close as eight to ten feet and a Cadillac automobile came to an abrupt halt on Moulton Street

and he saw this man get in the Cadillac on the passenger side and the car sped away going north on Sixth Avenue. This police officer turned around and gave chase at a speed of 60 miles per hour and he could not overtake the Cadillac but got close enough to write down the tag number. The last time he saw the Cadillac, it was turning west on Lafayette Street. He called headquarters on the radio and gave a description of the car and the tag number, but not the occupants.

Officer Reed testified the man who ran in front of his car and entered the Cadillac was black headed with rather long hair, about 5 feet 10 inches tall, and was wearing a white dress shirt and dark trousers. He did not get to see the face of the driver of the Cadillac but observed the back of his head. He said he had short hair—between a flat top and crew cut.

This officer further testified that this Cadillac had a Missouri tag and the number was B7G652, and that the car was headed west on Lafayette Street, which is in the direction of Town Creek, Alabama, on Highway 20. According to this officer, he next saw the Cadillac parked at the Decatur Police Department between eight and nine o'clock the same night and observed the two suspects. He recognized the one identified as Miller, as the man that ran in front of his car and entered the Cadillac and the one identified as Owens (appellant) as the driver of the Cadillac that he chased.

A photograph of appellant and Miller was taken at the Decatur jail with David Smith, a city detective. This photograph was shown officer Reed and he identified appellant as the driver of the Cadillac that he could not overtake and identified Miller as the man who ran in front of his car on Moulton Street earlier that night and enter the Cadillac. Reed then made an in-court identification of appellant.

After officer Reed lost the Cadillac on Lafayette Street and radioed headquarters,

an all points bulletin (A.P.B.) was put out by the operator. A state trooper, E. D. Smith, picked up the radio message at Town Creek, about 20 to 25 miles from Decatur, at the intersection of Alabama 101 and Highway 20. The Chief of Police of Town Creek drove to this intersection and got in the trooper's car. Fifteen minutes later they observed a 1969 Cadillac, tan in color with black vinyl top, with a Missouri license plate, approach this intersection. The trooper stopped the car and told the driver that he had received a dispatch on his radio and that the description of the car fit the one he was driving. He further told the driver:

"I received a report from our patrol station here in Decatur that a '68 or '69 Cadillac, brown in color, had just escaped from the Decatur Police and the occupants of this car were suspects in a burglary at the Diamond Jewelry Company over here in Decatur. That it went out 20 going west and outrun one of the Decatur Police cars."

This officer further testified that the patrol station stated that the Cadillac had a Missouri tag number and that he wrote the number down in a notebook he carries in the patrol car and the number was B7G652. He found a half pint of whiskey in the Cadillac and arrested the driver (appellant) for violating the prohibition law and appellant and his companion were carried to Town Creek City Hall and put in jail.

The Decatur Police Department was notified that the two suspects were in custody in Town Creek and three police officers were sent to get the suspects and the car and return to Decatur. Officer Carlton Haley was one of the three officers who returned the suspects to Decatur. He was asked how they were dressed and testified, "Yes, sir, this gentleman here (appellant) had on a white shirt and blue pants. Mr. Miller at Town Creek was wearing a blue knit sweater type shirt that buttoned up

along here on him and he had a t-shirt on under that, and he was wearing a light colored pants."

When the Decatur officers arrived, a search warrant issued by the Town Creek City Judge was produced and the trunk of the car was opened and the contents noted. The trunk was closed and the Cadillac and two suspects were carried to Decatur. At trial, the search warrant issued by the City Judge of Town Creek was not produced and its whereabouts is still a secret.

Another search warrant was applied for and issued by Judge Newton B. Powell, Judge of the Circuit Court of Morgan County. The affidavit and warrant are as follows:

"SEARCH WARRANT AFFIDAVIT

"STATE OF ALABAMA
"MORGAN COUNTY

IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA,

"Before me, the undersigned Circuit Judge in and for said State and County aforesaid, this day, personally appeared David Smith, who being known to me and who being first duly sworn to speak the truth disposes and says as follows:

"My name is David Smith, I am a Detective for the City Police Department in Decatur, Alabama.

"On the Second day of April, 1969, Diamond Jewelry Store located on Johnston Street, in Decatur, Alabama, was burglarized. At approximately 7:30 P.M., on said date and at said place, the burglary alarm at Diamond Jewelry was activated. Mr. Joe Hines arrived in his automobile, at said place and at said time, just as the aforesaid burglary alarm was activated, whereupon Mr. Hines saw two white males inside the aforesaid Jewelry Store. Mr. Hines chased these two white subjects from Diamond Jewelry to Moulton Street—which is parallel to Johnston Street in Decatur, Alabama. Mr. Hines lost sight of these two subjects when they disappeared in an alley located between Moulton Street and Holly Street in Decatur, Alabama. Mr. Hines immediately telephoned the City Police Department in Decatur, Alabama, whereupon a radio depatch (sic) was sent out by the police department to be on the look out for these two white subjects. Approximately five minutes (seven-thirty six p. m.) (sic) Earl J. Miller was observed by Officer David Reed leaving the aforesaid alley between Holly Street and Moulton Street—whereupon the said Earl J. Miller ran to an automobile, being driven by Norman Owens in an easternly direction on Moulton Street. Officer David Reed, of the Decatur Police Department, was notified vila (sic) radio to be on· the lookout for two white subjects in the Moulton Street area about one minute before he observed Earl J. Miller entering said automobile driven by Norman Owens. Officer Reed attempted to overtake the automobile driven by Owens, but the said automobile outran Officer Reed on Sixth Avenue in Decatur, Alabama. However, Officer Reed identified the said automobile as one 1969 Cadillac, tan in color, two door, and bearing Missouri license plate number B7G652. Officer Reed last observed the said Cadillac automobile traveling in a westward direction on the Lafayette Street in Decatur, Alabama at a high rate of speed —whereupon he alerted all law enforcement officials in the North Alabama area that two suspected white male subjects traveling in the afore described Cadillac, were wanted in Decatur, Alabama on suspicion of burglary of the Diamond Jewelry Store in Decatur, Alabama.

"At approximately 7:54 P.M. Earl J. Miller and Norman Owens were apprended (sic) by law enforcement offi-

cials in Town Creek, Alabama. The said Earl J. Miller and Norman Owens were returned to the City jail, along with the said 1969 Cadillac automobile, at approximately 9:00 P.M. on the same night Diamond Jewelry was burglarized.

"Prior to midnight, on April 2, 1969, both Earl J. Miller and Norman Owens were advised of their constitutional rights by Detective David Smith. At approximately 10:00 A.M. on April 3, 1969, Detective David Smith asked Earl J. Miller if he had any papers to prove ownership of the said Cadillac automobile. The said Earl J. Miller voluntarily and subsequent to being advised of his constitutional rights consented to show Detective Smith an owners manual in the glove compartment of the Cadillac automobile. When Earl J. Miller opened the glove compartment Detective Smith saw an instrument in the glove compartment which is known as a 'lock pick' used by burglars to pick locks. Detective Smith took the lock pick into his possession at said time and place. Detective Smith asked Earl J. Miller what was the lock pick, whereupon Earl J. Miller replied 'I don't know'.

"The said Cadillac automobile is presently located at the police department in Decatur, Alabama. The said Cadillac Automobile is in the care, custody and control of the City of Decatur, Police Department.

"Wherefore, your affiant requests that Your Honor issue a warrant for the search of the said 1969 Cadillac automobile located at Police Department in Decatur, Alabama, based upon probable cause for his belief that additional burglary tools used to gain entrance in Diamond Jewelry in Decatur, Alabama will be found in said automobile. The lock on the front door of Diamond Jewelry Company on said time and occasion, was pulled from its stationary position in the front door by some type device or tool.

"David Smith

"Sworn to and subscribed before me this the 3rd day of April, 1969.
    "Newton B. Powell, Circuit Judge

"SEARCH WARRANT

"STATE OF ALABAMA
"MORGAN COUNTY

IN THE CIRCUIT COURT OF
MORGAN COUNTY, ALABAMA

"Proof and affidavit having this day been made before me by affidavit and testimony of Officer David Smith that Earl J. Miller and Norman Owens are concealing on or about 1969 Cadillac automobile tan in color, two door, and bearing Missiouri (sic) license plate number B7G 652 located at the police station at Decatur, Alabama, burglary tools used to break and enter Diamond Jewelry Store in Decatur, Alabama on April 2, 1969.

"You are, therefore, commanded in the day time, to make an immediate search of the aforedescribed Cadillac automobile located at the city police department in Decatur, Alabama for burglary tools.

"And if you find the same or part thereof, to bring it forthwith, before me at the next term of the Circuit Court of Morgan County, Alabama and no later than ten days from the issuing of this writ, at the courthouse in Morgan County, Alabama.

"Done and ordered this the 3 day if (sic) April, 1969.

    "Newton B. Powell, Circuit Judge"

The search was conducted and the contents of the Cadillac automobile were removed by the officers and the evidence preserved for trial. All items taken from the car were introduced in evidence over the objections of appellant.

A line-up was conducted under the supervision of Detective David Smith and Joe Hines identified appellant as one of the men he saw in front of the Diamond Jewelry Company on the night of April 2, 1969, and this witness then made an in-court positive identification of appellant as the man who ran out of the Diamond Jewelry Store when his companion shouted, "let's go."

Before the line-up was conducted, appellant and his companion were given the *Miranda* rights. After stating they understood their rights, both appellant and Miller told the officers they lived in St. Louis, Missouri.

From the record:

"Q. Before you had the lineup, did you talk with the defendant and advise him of his constitutional rights?

"A. Yes, sir, I advised Mr. Miller and Mr. Owens at the same time.

"Q. Tell the Judge what you advised him of?

"A. We have a set format laid out on a piece of paper that said—Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say could be used against you in Court. You have the right to talk to a lawyer before answering any questions and have him with you during questioning. If you cannot afford a lawyer one will be appointed for you. If you decide to, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. A lawyer would be provided if he wanted one. Both of them said they did not need a lawyer. I advised them they would be placed in a lineup and did not have the right to refuse to be placed in a lineup, but had a right to have an attorney present. They did not need an attorney and had no objection to a lineup.

"Q. Did they sign any kind of written waiver form or did they state it?

"A. No, sir, they refused to sign anything.

"Q. But they did say go ahead, we don't want a lawyer. You can have the line up?

"A. Yes, sir.

"Q. And this was prior to getting the people to put in the lineup and this sort of thing?

"A. That's correct."

Appellant testified on *voir dire* out of the presence of the jury that he was told he had a right to an attorney at the lineup; that he looked at Miller and then said, "We will go ahead and have the lineup without a lawyer."

The next morning after the burglary, Detective Smith, in tracing the route that Joe Hines said the suspects followed after the burglar alarm sounded, found a blue bag in a parking lot a short distance from the jewelry store. Mr. Smith testified the blue bag contained burglary tools and they were introduced in evidence over appellant's objections. Hines had testified that he did not see anything in the hands of the suspects as they were running from the jewelry store.

The record is entirely silent as to any description of the suspects in any radio dispatch based upon any statement or report from Joe Hines.

Police officer Carlton Haley testified that when they got to Town Creek to pick up the suspects and return them along with the Cadillac to Decatur, they examined the contents of the trunk of the car. When asked how they got into the trunk, he said:

"The officer in charge of the desk there in Town Creek has some belongings which belonged to these men in jail, * * * and he took the key that fit the trunk and we got into it that way."

When asked what they found in the trunk, he said:

"There were several different types of punches, sledge hammers, crowbars, there was a battery operated drill. There was also gloves and there was two or three different types of punches. Some of these punches had been made to fit into the head of one of the sledge hammers that was in this case. Also a bag."

While this search was going on, both appellant and Miller were in jail in Town Creek, and the Cadillac was parked on the street next to the police department.

This witness further testified that they searched the glove compartment and found a pair of gloves, a file and some wirepliers.

This officer testified that appellant and Mr. Miller were given their "rights" at Town Creek before they were brought back to Decatur and again at Decatur.

There is a complete severance of identities or nexus between all the suspects in this case and the two men in the Cadillac the officers stopped in Town Creek in response to a police radio bulletin. First, we have Mr. Hines, the barber, describing, *at trial*, the physical appearance and dress of the two suspects he chased on foot. He said they were neatly dressed with coats and ties. He did not relate any of this in his initial call to the police. Moreover, he did not say whether the suspects were white or black. Secondly, we have officer Reed picking up a radio dispatch about the burglary involving two men and his suspicion was aroused by the flight of two black men across Sixth Avenue and who disappeared in a washette. Thirdly, officer Reed's suspicion was diverted by someone immediately in front of his car shouting, "hey", a Cadillac coming to a screeching halt and taking on a passenger. He described his dress as being a white shirt and dark trousers. Reed's description of their hair styles, dove-tails, with that of Mr. Hines at trial.

All of these matters transpired within a thirty to forty minute period of time after the burglary alarm system at Diamond Jewelry Store was activated, and within a two block radius of the store. Twenty-five to thirty minutes after Reed lost sight of the Cadillac, the occupants thereof were stopped in Town Creek, in another county, twenty-five miles from Decatur.

A description of the two suspects as described by Joe Hines was never broadcast by the police. At least that is the state of this record. In sum then, the officers at Town Creek had nothing to go on except a radio bulletin giving a description of an automobile (Cadillac), with a Missouri tag (B7G652), and there would be two occupants (undescribed).

Did the officers at Town Creek have sufficient probable cause to stop appellant? The answer to this question is the key to the case. It is a close and troublesome case. Close and troublesome because of the decisions of the Supreme Court of the United States tracking off in every conceivable direction like a floundering ship in tempestuous waters without rudder, compass card, lighthouse or pilot boat to guide and lead us safely into a port or harbor for mooring. That Court unabashedly admits its inconsistency in search and seizure cases. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. In this area of constitutional law, state courts do not know where they have been nor where they are headed on a year to year basis, but we must keep going.

The trial court tried the search and seizure phase of this case under the guidance of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419. *Chambers* and this case are factually different. The facts in *Chambers*:

"During the night of May 20, 1963, a Gulf service station in North Braddock, Pennsylvania, was robbed by two men,

each of whom carried and displayed a gun. The robbers took the currency from the cash register; the service station attendant, one Stephen Kovacich, was directed to place the coins in his right-hand glove, which was then taken by the robbers. Two teen-agers, who had earlier noticed a blue compact station wagon circling the block in the vicinity of the Gulf station, then saw the station wagon speed away from a parking lot close to the Gulf station. About the same time, they learned that the Gulf station had been robbed. They reported to police, who arrived immediately, that four men were in the station wagon and one was wearing a green sweater. Kovacich told the police that one of the men who robbed him was wearing a green sweater and the other was wearing a trench coat. A description of the car and the two robbers was broadcast over the police radio. Within an hour, a light blue compact station wagon answering the description and carrying four men was stopped by the police about two miles from the Gulf station. Petitioner was one of the men in the station wagon. He was wearing a green sweater and there was a trench coat in the car. The occupants were arrested and the car was driven to the police station. In the course of a thorough search of the car at the station, the police found concealed in a compartment under the dashboard two .38-caliber revolvers (one loaded with dumdum bullets), a right-hand glove containing small change, and certain cards bearing the name of Raymond Havicon, the attendant at a Boron service station in McKeesport, Pennsylvania, who had been robbed at gunpoint on May 13, 1963. In the course of a warrant-authorized search of petitioner's home the day after petitioner's arrest, police found and seized certain .38-caliber ammunition, including some dumdum bullets similar to those found in one of the guns taken from the station wagon."

The Court said:

"We pass quickly the claim that the search of the automobile was the fruit of an unlawful arrest. Both the courts below thought the arresting officers had probable cause to make the arrest. We agree. Having talked to the teen-age observers and to the victim Kovacich, the police had ample cause to stop a light blue compact station wagon carrying four men and to arrest the occupants, one of whom was wearing a green sweater and one of whom had a trench coat with him in the car.

"Even so, the search that produced the incriminating evidence was made at the police station some time after the arrest and cannot be justified as a search incident to an arrest: 'Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest.' Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968), is to the same effect; the reasons that have been thought sufficient to justify warrantless searches carried out in connection with an arrest no longer obtain when the accused is safely in custody at the station house.

"There are, however alternative grounds arguably justifying the search of the car in this case. In Preston, supra, the arrest was for vagrancy; it was apparent that the officers had no cause to believe that evidence of crime was concealed in the auto. In Dyke, supra, the Court expressly rejected the suggestion that there was probable cause to search the car, 391 U.S., at 221–222, 88 S.Ct. 1475-1476. Here the situation is different, for the police had probable cause to believe that the robbers, carrying guns and the fruits of the crime, had fled the scene in a light blue compact station wagon which would be carrying four men, one wearing a green sweater and

another wearing a trench coat. As the state courts correctly held, there was probable cause to arrest the occupants of the station wagon that the officers stopped; just as obviously was there probable cause to search the car for guns and stolen money.

\* \* \* \* \* \*

"Neither Carroll, [Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543,] supra, nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords. But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in Carroll and the case before us now, if an effective search is to be made at any time either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

"In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search. Carroll, supra holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible.

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

"On the facts before us, the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained. \* \* \*"

Because of the factual difference in *Chambers* and this case, and in light of the above quoted pronouncements in *Chambers,* we do not believe that *Chambers* controls this case.

In *Chambers* the police had probable cause to believe that the robbers, carrying guns and the fruits of the robbery, had left the scene in a blue compact station wagon, carrying four men, one wearing a green sweater and another wearing a trench coat. Here the situation is entirely different. The last time Joe Hines saw the burglars, they were on foot and were wearing coats and ties, one had a crew cut hair style and

the other had long hair worn in a pompadour type hair style. Hines never saw these men in any kind of vehicle and he did not give any kind of a description of the burglars to the police for release on a radio bulletin.

We think that Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306, controls this case.

The facts in *Whiteley* are as follows:

"'On November 23, 1964, certain business establishments in Saratoga were broken into; including the Rustic Bar and Shively's Hardware, the offenses being investigated by the Carbon County Sheriff, [Sheriff Ogburn] who, acting on a tip the next day signed a complaint charging defendant and another with breaking and entering the building identified as the Rustic Bar. This complaint was made before a justice of the peace at approximately 11:30 a.m. on the 24th, and a warrant issued. After the investigation, the sheriff put out a state item on the radio to pick up two suspects of the breaking and entering, defendant and another. The message went to the network at Casper and was transmitted over the State, received by the Albany County Sheriff's Office and communicated to the Laramie Police Department, the message giving names and descriptions of the two persons and advising the type of car probably being driven and the amount of money taken, including certain old coins with the dates. Late at night on November 24, a Laramie patrolman, in reliance on the information in the radio item, arrested the defendant and his companion. At the time, the patrolman had no warrant for defendant's arrest nor search warrant. The officer together with a deputy sheriff, who had come up in the meantime, searched the car and removed a number of items introduced in evidence, including tools and old coins, identified at the trial as taken from Shively's Hardware. * * *'

"Sheriff Ogburn's complaint, which provided the basis for the arrest warrant issued by the justice of the peace, is as follows:

"'I, C. W. Ogburn, do solemnly swear that on or about the 23 day of November, A.D. 1964, in the County of Carbon and State of Wyoming, the said Harold Whiteley and Jack Daley, defendants did then and there unlawfully break and enter á locked and sealed building [describing the location and ownership of the building].' App. 28.

"A state item 881, the bulletin which Sheriff Ogburn put out on the radio and which led to petitioner's arrest and search by the Laramie patrolman, is as follows:

"'P & H for B & E Saratoga, early A.M. 11–24–64. Subj. #1. Jack Daley, med.build, med.comp., blonde and blue. Tat. left shoulder: "Love Me or Leave Me." #2. Harold Whitley, WMA, 43 D.O.B. 6-22-21, 5'11", 180, med. build, fair comp. brown eyes. Tat. on right arm "Bird." Poss. driving 1953 or 1954 Buick, light green bottom, dark top. Wyo. lic. 2-bal. unknown. Taken: $281.71 in small change, numerous old coins ranging from .5¢ pieces to silver dollars, dated from 1853 to 1908. Warrant issues, will extradite. Special attention Denver. * * *' App. 31."

In *Whiteley* the court considered whether officers in an adjacent county may rely on a police radio broadcast in making an arrest. The court said:

"We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an other-

wise illegal arrest cannot be insulated from challenge by the decision of the investigating officer to rely on fellow officers to make the arrest."

In *Whiteley,* supra, the court invalidated a subsequent search of petitioner's automobile because the arresting officers did not have sufficient probable cause for a warrantless arrest of petitioner on the strength of a state police bulletin issued on the complaint of the sheriff of an adjoining county. The sheriff had obtained an arrest warrant pursuant to an informer's tip and the sheriff's naked conclusion that petitioner and his companion were guilty of breaking and entering certain business establishments. The court held the complaint of the sheriff was conclusory and would not support an independent judgment of probable cause.

The Court went on to say:

"In sum, the complaint on which the warrant issued here clearly could not support a finding of probable cause by the issuing magistrate. The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime. Therefore, petitioner's arrest violated his constitutional rights under the Fourth and Fourteenth Amendments; the evidence secured as an incident thereto should have been excluded from his trial. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)."

There is much less reason for a finding of probable cause for the arrest of appellant in this case than existed in *Whiteley.* Here, we have an eye witness account of an abortive burglary with *no detailed description* of the suspects broadcast on the police dispatch. There is a "missing link" of mammoth proportions here when we consider officer Reed's groundless conclusion that the two men he saw in the Cadillac were the subjects of the initial police broadcast concerning the burglary. This is verified by the fact that Reed's initial attention following the radio alert was drawn to two black men hurriedly crossing a busy street. The race of the two burglary suspects had not been mentioned in the first radio dispatch. See Eaton v. State, 45 Ala.App. 464, 231 So.2d 918.

■ The measure of the legality of warrantless searches and seizures is whether the seizing officers have probable cause for believing that the automobile they stop contains stolen property, illegal contraband or other fruits of a crime. Following *Whiteley,* supra, the officers at Town Creek could rely on the radio broadcast but the subsequent determination by any court as to probable cause must necessarily turn on all the circumstances giving rise to the police dispatch. Whiteley v. Warden, supra; United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684.

■ It is axiomatic that the validity of an arrest does not determine the legal efficacy of an automobile search where there is independent cause for the officer to believe that the contents of the automobile offend against the law. Carroll v. United States, 267 U.S. 132 at 158–159, 45 S.Ct. 280 at 285–286, 69 L.Ed. 543. It is apparent here that there was no probable cause to search the Cadillac because the necessary nexus between the two men on foot seen by Mr. Hines and the men in the car observed by officer Reed had never been established. Though the law does not require a certainty when ascertaining "probable cause", it does require more than mere intuition coupled with suspicion. Nor is there any showing here that brings this case within the ambit of the "exigent circumstances" doctrine announced in *Carroll,* supra, because neither appellant nor his companion were capable of removing the automobile while sojourning in jail. Sheridan v. State, 43 Ala.App. 239, 187 So.2d 294; McCurdy v. State, 42 Ala.App. 646, 176 So.2d 53.

The search of the automobile at Town Creek was violative of appellant's Fourth and Fourteenth Amendment rights and the

evidence gained as a result of this primary search should have been excluded at his trial under the "fruit of the poisonous tree" doctrine. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct 182, 64 L.Ed. 319; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441. After the Decatur police returned the prisoners to the city jail in Decatur, the lineup was conducted and the next day a search warrant was obtained and the Cadillac was searched for the *third* time. It was this last search which produced the various burglary tools introduced at the trial.

In *Wong Sun,* supra, the Supreme Court stated the test to be:

"'[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means distinguishable from the primary taint.'" (original citations omitted) 371 U.S. at 488, 83 S.Ct. at 417.

This case is not one where the evidence was independently arrived at but rather it was the illegal search at Town Creek which provided the impetus for the subsequent search at Decatur.

We have treated the missing search warrant at Town Creek as "no search warrant." It is obvious that the evidence introduced at the trial was *derivative only* and was not discovered by means sufficiently distinguishable to be purged of the primary "taint." See generally, Annot. 43 A.L.R.3rd 840, and Duncan v. State, 278 Ala. 145, 176 So.2d 840, for a discussion of the fruit of the poisonous tree doctrine and its application.

Inasmuch as this case must be reversed for failure of the trial court to exclude the evidence found and taken from the trunk of the Cadillac, we do not deem it necessary to respond to all of appellant's other insistences of error. In the light of a new trial, we will make a few observations on matters that may arise again.

In the absence of a statute to the contrary, a judge is not disqualified to review his own former judicial acts. McConnell v. Goodwin, 189 Ala. 390, 66 So. 675. The rule is otherwise if he is a necessary and material witness in the case, is biased or prejudiced, or some additional common-law grounds (aside from the statutory grounds of disqualification) supporting the need for a judge to be indifferent in all causes before him. Malone v. State, 46 Ala.App. 363, 242 So.2d 409; Crowden v. State, 41 Ala.App. 421, 133 So.2d 678; Wiggins v. State, 39 Ala.App. 433, 104 So. 2d 560.

It is to be noted that the affidavit leading up to the issuance of the search warrant by Judge Powell, and the search warrant, are dated April 3, 1969. Appellant was indicted on June 12, 1969, and tried on November 30, 1970. No return was ever made to the search warrant as required by law, Title 15, Section 111, Code of Alabama 1940, *and as required by the search warrant itself.* The affidavit and search warrant were never filed in court, but remained in the possession of affiant, David Smith, until he took the witness stand during the trial of this case. It is highly improper and irregular for a police officer to keep possession of a court document that should be in the Clerk's office for public inspection and copying by interested parties or attorneys. A secret or hidden court document could well prevent a lawyer from adequately preparing a defense for his client. This officer's conduct in concealing these court papers for nearly twenty (20) months and revealing them in the midst of trial without prior opportunity for defense counsel to see, inspect and examine same and chart the course of their defense is, to say the least, reprehensible and borders on a denial of due process. Had these documents been filed in their proper place, they most likely would have triggered a pre-trial motion to suppress the evidence found in the trunk of the automobile at which hearing the issuing magistrate would probably have been a witness

resulting in the assignment of another judge to preside over the primary trial.

■ The trial court did not err in overruling appellant's objection to the closing argument of the district attorney, wherein he said:

"Ladies and gentlemen, this man is guilty of burglary. I will look you right in the eye and tell you that you ought to convict him."

Before overruling the objection, the trial court said:

"THE COURT: The statement as to what—The question of whether or not a man is guilty or not guilty is up to the Jury and you are the ones to make the decision. If a District Attorney says he is guilty, then it's an argument. If a Defense Counsel says he isn't guilty, that's an argument. The argument is not a statement of a fact and the Court doesn't construe it as a statement of fact and the context in which it was given is construed as an argument only, and the opinion of the District Attorney based upon the concept of the evidence. Now, I have told you previously that you will be given the law concerning this case, and I will overrule the objection to that on that explanation."

Some of the Federal cases hold such argument to be improper and reversible. A host of Alabama cases are the other way. Ellis v. State, 244 Ala. 79, 11 So.2d 861; Cranmore v. State, 41 Ala.App. 276, 129 So.2d 121; Ross v. State, 46 Ala.App. 88, 238 So.2d 887; Tucker v. State, 28 Ala. App. 492, 188 So. 276; Griggs v. State, 21 Ala.App. 530, 109 So. 611.

■ The court below did not abuse its discretion in requiring appellant to strike a second jury from the same venire after the first jury was struck. The trial judge offered appellant an option: (1) keep the first jury, or (2) strike another jury from the rest of the venire. Appellant argues that he was greatly disadvantaged by the action of the trial court because the state was then familiar with his strikes and could more intelligently strike the second jury. This is true, but the state suffered in kind and degree. Davis v. Wingard, 269 Ala. 535, 114 So.2d 450.

This case is due to be and is hereby reversed and remanded.

Reversed and remanded.

CATES, P. J., and TYSON and De-CARLO, JJ., concur.

ALMON, J., dissents.

ALMON, Judge (dissenting).

I respectfully dissent inasmuch as I feel the "fruits of the poisonous tree" doctrine inappropriate to the facts in this case.

Chief Justice Burger, then a Circuit Judge, in Harried v. United States, 128 U. S.App.D.C. 330, 389 F.2d 281, wrote:

". . . From its inception, the 'fruit of the poisonous tree' doctrine has not applied where the information was also obtained from an 'independent' source. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). See Costello v. United States, 365 U.S. 265, 280, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961)."

The search warrant issued by Judge Powell was supported by an affidavit alleging facts sufficient to show probable cause. Nothing on the face of the affidavit indicated a prior search. More importantly, none of the facts alleged in the affidavit were acquired by exploitation of knowledge gained as a result of the first search.

The point is that probable cause existed at the time of the Decatur search. This probable cause was established by facts totally separate and independent of the fruits of the prior search.

An illegal search by police officers should not forever preclude them from later effecting a legal search where the fruits of the prior illegal search in no way contributed to the subsequent valid search. The rationale in United States v. Iannelli, 339 F.Supp. 171, supports this view.

## ON REHEARING

In its application for rehearing, the state raises the following points:

1. That there is not a complete severance of identities or nexus between the suspects being chased by Joe Hines, the barber, and the suspects who were chased in the Cadillac automobile by officer Reed.

2. That the "fruit of the poisonous tree" doctrine does not apply to a second search based upon a valid search warrant issued on facts and evidence independent of a prior illegal search.

In support of the first point, the argument runs that "while parked, he (officer Reed) got a second communication on the radio from the Decatur Police giving a more specific description of the burglary suspects. Although he did not specify the more specific description he received in this second communication, *he must have been informed that the suspects were white, * * *"* etc. (Emphasis added), and "In the present case, officer Reed radioed in to the Decatur Police a description of the car, the car's tag number, *and appparently described the two white subjects in the car,* and merely related to the Decatur Police what he saw and what he was doing, as he chased the two white subjects from Decatur. It was the radio dispatch which came from the Decatur Police Headquarters *which combined the information furnished by officer Reed with the information which had been furnished by the caller on behalf of Joe Hines, the barber.* * * * In other words, the radio dispatch which was issued by the Decatur Po-

lice Department and later received by the arresting officer, was not based upon an arrest warrant issued without probable cause, nor was it based upon mere conclusions, but rather was based upon the information which the dispatcher had at his disposal from officer Reed and from the caller for Joe Hines." (Emphasis added).

We cannot make the same assumptions and draw the same conclusions as the Attorney General, through his able Special Assistant, from a silent record. The caller for Joe Hines did not give a description of *any kind* to the police, not even the color of the suspects. No other radio dispatch gave a description of the suspects. At trial Mr. Hines testified that both suspects were neatly dressed, wearing coats and ties. When arrested, appellant and his companion were not wearing coats and ties and none were found in the car. Our statement, "There is a complete severance of identities or nexus between all the suspects in this case and the two men in the Cadillac the officers stopped in Town Creek in response to a police radio bulletin", is completely supported by the record.

Point Two (2). "Fruit of the poisonous tree".

Was the search warrant issued by Judge Powell based upon probable cause "established by facts totally separate and independent of the fruits of the prior search"? Stated another way, were the facts alleged in the affidavit "acquired by exploitation of knowledge gained as a result of the first search"?

The facts as they appear in this record answer the first question in the negative and the second question affirmatively.

The officer-affiant, David Smith, testified as follows on direct examination:

"Q. And you say the officers that went down to Town Creek relayed some information to you?

"A. Yes, sir, that is correct.

"Q. What did they tell you?

"A. They told me that a search of the car had been made there and that there was various tools and so forth in the car.

"Q. That they had seen themselves?

"A. Yes, sir.

*　　*　　*　　*　　*　　*

"Q. Did they relate to you that these tools and items and so forth looked like burglary tools to them?

"A. Yes, sir.

"ON CROSS EXAMINATION

"Q. After the car was brought back here and you assembled this information, did you appear before a judge and make an affidavit and get a search warrant?

"A. This was the next day."

The affidavit made by this witness before Judge Powell upon which the search warrant was issued was false in several respects. The affidavit recites, in part:

"*　*　*　Mr. Hines immediately telephoned the City Police Department in Decatur, Alabama, whereupon a radio dispatch was sent out by the police department to be on the look out for these two white subjects. *　*　* Officer David Reed, of the Decatur Police Department, was notified vila (sic) radio to be on the look out for two white subjects in the Moulton Street area about one minute before he observed Earl J. Miller entering said automobile driven by Norman Owens. *　*　*"

The record simply does not bear out the affidavit describing the two suspects as being white. At no time was a description of the suspects given in any radio dispatch and officer Reed did not testify to the contrary.

Further the affidavit concludes:

"Wherefore, your affiant requests that your Honor issue a warrant for the search of the said 1969 Cadillac automobile located at Police Department in Decatur, Alabama, based upon probable cause for his belief that additional burglary tools used to gain entrance in Diamond Jewelry in Decatur, Alabama, will be found in said automobile. The lock on the front door of Diamond Jewelry Company on said time and occasion, was pulled from its stationary position in the front door by some type device or tool."

"Probable cause for his belief"—indeed! He had direct knowledge that burglary tools were in the trunk of this automobile. This knowledge was gained as a result of the first search and was related to this officer-affiant by the three officers sent to Town Creek and who opened the trunk of the car while appellant and his companion were in jail. The poison flowed from Town Creek all the way to Decatur and the taint of illegality permeated the atmosphere at the temple of justice when police officer David Smith went before the issuing magistrate seeking a search warrant in hopes of "covering up" the officers' prior illegal activities. This officer suppressed the true facts from the magistrate and thus committed a fraud on the court. He was successful in keeping his fraudulent scheme hidden away for twenty (20) months and if appellant had pleaded guilty it would never have come to light.

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court but that it shall not be used at all." Silverthorne Lumber Co., supra.

Opinion extended. Application overruled.

CATES, P. J., and TYSON and De-CARLO, JJ., concur.

ALMON, J., dissents.