HARRIS, Presiding Judge.
Appellant was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. Appellant was represented by counsel of his own choice and at arraignment pleaded not guilty. After sentence was imposed appellant gave notice of appeal and trial counsel represents him on this appeal.
There was no motion to exclude the State’s evidence; there was no request for the affirmative charge, and no exceptions were reserved to the oral charge to the jury. Appellant did file a motion for a new trial on the ground, among others, that the evidence was insufficient to sustain the verdict of the jury. This puts us to a recital of the evidence.
Wallace Hubbard testified that he lived in Jemison, Alabama, and that he was married to the victim in this case for thirty-two years. On August 1, 1977, shortly after eight o’clock that evening, Hubbard and his wife walked out on the carport of their home. Hubbard testified that he had been talking to his wife four or five minutes, when he heard a gun shooting and saw his wife fall, bleeding at the mouth. Hubbard did not see appellant until after his wife had fallen. Then, appellant fired “some more, but I don’t know where he shot.” After the shots were fired, Hubbard got a single barrel twelve-gauge shotgun and fired at appellant. Police arrived on the scene at that time, and Hubbard turned his weapon over to Jeff Townsend, one of the officers. Shortly thereafter, an ambulance arrived and carried Mrs. Hubbard from the shooting scene. Hubbard further testified that his wife was buried two days later.
Hubbard further testified that his shotgun was in the house at the time appellant shot and killed his wife. Appellant did not testify and no evidence tending to show self-defense was presented to the jury.
On cross-examination, Hubbard testified that appellant had lived across the street from him for a year and a half. During that time, appellant had frequently “cussed” Hubbard or someone at the Hubbard residence. At the time the shooting occurred Hubbard testified that he had a cigarette in his hand.
Donald Porter testified that on August 1, 1977, he lived next door to appellant, whose house was directly across the street from the Hubbard residence. That evening, approximately 8:15, Porter heard appellant cursing and walked around the comer of his house. There he saw appellant in his front yard holding a shotgun. Porter further testified that appellant shouted at Hubbard, “. . . if he was a man to get him a gun, . . . and start out toward the road, that he would drop him before he got out there.” In a few seconds Porter saw appellant raise the shotgun and saw Hubbard standing in front of his pickup. At that same time, Porter heard a gunshot coming from Avery’s direction. Porter turned to go inside his house and then heard two more gunshots come from the same direction as the first blast. About ten or fifteen minutes later Porter heard another shot and saw police arrive on the scene.
*1038 On cross-examination, Porter testified that he saw Hubbard holding something in his hand but he could not be sure what it was, saying, “It could have been one of ten or fifteen things, a hoe, a shovel or anything.” Porter also testified that he had previously had trouble with appellant and had torn down a fence between their houses.
On redirect examination, Porter testified that he saw three shotgun shells, two red ones and a green one, in appellant’s yard after the shooting.
T. J. Lockhart testified that he was Sheriff of Chilton County on the night of August 1, 1977. Lockhart found three spent shotgun shells in appellant’s yard. They were gathered by Investigators Beutler and Smitherman to preserve as evidence.
Sherrill Hilyer testified that he lived sixty-five to seventy yards from appellant’s house. About 8:15 p. m. on the evening of August 1,1977, Hilyer heard a man cursing and stepped out on his front porch, seeing a man standing in Avery’s yard. As he stepped back inside his house he heard two gunshots and looked back out again, seeing this man fire a gun, lower it, light a cigarette and walk back towards the Avery residence. Prom the distance he was from the Avery home, Hilyer could not identify the gunman.
John Beutler testified that he was an investigator for the Chilton County Sheriff’s Department. On the evening of August 1, 1977, Beutler investigated an incident at the Hubbard home. After a conversation with Jeff Townsend, Beutler armed himself with an automatic weapon, went to the Avery home and placed appellant under arrest. Beutler was given a twelve gauge pump shotgun by appellant’s wife. Subsequently Beutler turned this weapon over to the State Toxicologist, Dr. Richard Roper. Beutler also testified that he recovered three spent shotgun shells from the front yard of appellant’s home. These shells were also given to Roper. Beutler testified that, from the site of the shells to the location of Mrs. Hubbard’s body, there was a clear view.
Doctor Richard Roper testified that he was an employee of the State of Alabama, Department of Toxicology and Criminal Investigation. Appellant stipulated to Roper’s qualifications as an expert in his field.
Roper testified that he conducted a postmortem examination on the body of Velma Hubbard on August 2, 1977. At that time Roper observed a pattern of small penetrating wounds, numbering in excess of eighty, twenty-nine inches by seventeen inches. This pattern was widely distributed over the face, chest and abdomen of the body. In Roper’s opinion, Mrs. Hubbard’s death was caused by “acute internal hemorrhaging or massive bleeding within the body as a result of a shotgun wound to the body.” The pellets, some of which Roper recovered from Mrs. Hubbard’s body, he described as “duckshot”. These were turned over to Thomas Hopen at the Montgomery laboratory of the Department.
Thomas Hopen testified that he was a Crime Laboratory Analyst with the Department of Toxicology and Criminal Investigation in Montgomery, Alabama. Hopen conducted numerous test firings of the shotgun taken from appellant’s home and formed the opinion that the spent shells found in appellant’s yard were fired from the same weapon. An examination of pellets removed from Mrs. Hubbard’s body revealed that they were number four shot. The shotgun, pellets, and spent shells were received in evidence without objection. Ho-pen’s testimony concluded the State’s case.
Annie Ruth Brown testified that she lived in Clanton, Alabama, and frequently visited the Averys. Mrs. Brown testified that Hubbard and appellant fussed “time after time,” Hubbard two or three times threatening to shoot appellant. On August 1,1977; Mrs. Brown saw Hubbard out by his truck drinking beer at approximately 6:30 p. m. In the truck on a rack was a gun.
Michael Duran testified that he lived in the same neighborhood as Hubbard and appellant. Usually every weekend the two men would “holler and scream and cuss one another.” Hubbard initiated these shouting *1039 matches when he was drunk. On cross-examination, Duran admitted having been convicted once of grand larceny.
Rhonda Jo Avery testified that she was appellant’s daughter. She further testified that Hubbard drank frequently and used profane language. On cross-examination, Miss Avery testified that she was not at home at the time of the fatal incident.
Miley Jackson Avery testified that he was appellant’s son. He testified subsequently to the same facts as did his sister, and also testified that he was not home at the time of the shooting. Jackson Avery’s testimony concluded the defense.
The State then recalled Mrs. Annie Ruth Brown. She testified that she was at the Avery home until seven the evening of August 1, 1977. Appellant was not drinking.
The State’s case against appellant consists of overwhelmingly strong circumstantial evidence. Although no one actually saw appellant pull the trigger, a review of the facts above shows that appellant was standing in his front yard with a shotgun; that appellant “called out” Hubbard and threatened him; that a man standing in appellant’s front yard fired a shotgun in the direction of Hubbard’s home; that three spent shotgun shells were found in appellant’s front yard; and that a shotgun recovered in appellant’s home fired the spent shells recovered from the yard of appellant’s home.
In a criminal prosecution circumstantial evidence is entitled to the same weight as direct evidence, provided that it points to the guilt of the accused. Hudson v. State, Ala.Cr.App., 354 So.2d 328. Here the State’s evidence of such a cogent degree pointed directly to appellant as the gunman who killed Mrs. Hubbard and it is sufficient to sustain his conviction.
After appellant’s case was called for trial, and a jury struck and sworn, it was discovered that one of the jurors was a second cousin of the victim. The trial court discharged the jurors asking all of them with the exception of the “related” juror to return to the jury panel. Then the trial court stated that another jury would be selected from the same panel from which the first jury was struck. Appellant moved for a mistrial and asked that the case be continued till the next term of court. The trial court denied the motion and another jury was struck.
Appellant contends that such a procedure was erroneous and a continuance should have been granted, citing, Murray v. State, 210 Ala. 603, 98 So. 871, and Johnson v. State, 53 Ala.App. 354, 300 So.2d 392, cert. denied, 293 Ala. 760, 300 So.2d 396.
While we are aware that the procedure requested by appellant is mandated in capital cases, Murray and Johnson, supra, it is not required in a non-capital case. Special venire rules are not applicable to first degree murder cases since it is no longer a capital felony. Usrey v. State, 54 Ala.App. 448, 309 So.2d 485. For numerous other authorities to the same effect, see 13 Alabama Digest, Jury, ®=»70(1).
In Owens v. State, 51 Ala.App. 50, 282 So.2d 402, cert. denied, 291 Ala. 794, 282 So.2d 417, the trial court required the defendant to strike a jury from a panel which included members of a jury which had previously been struck. This Court wrote,
“The court below did not abuse its discretion in requiring appellant to strike a second jury from the same venire after the first jury was struck. The trial judge offered appellant an option: (1) keep the first jury, or (2) strike another jury from the rest of the venire. Appellant argues that he was greatly disadvantaged by the action of the trial court because the state was then familiar with his strikes and could more intelligently strike the second jury. This is true, but the state suffered in kind and degree. Davis v. Wingard, 269 Ala. 535, 114 So.2d 450.”
A careful search of the record reflects no error injuriously affecting the substantial rights of the appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.