Possession of cocaine: five years.
Briefly, the facts were that a Montgomery police officer, attached to the narcotics and dangerous drugs detail, received information over the telephone from an informer. That information was in reference to Milan Nikolic [the appellant] and two companions. After a short surveillance, the appellant and two companions were apprehended and four small bags of white crystalline powder, later determined to be cocaine, were seized.
Prior to trial, the appellant filed a motion to suppress, and an evidentiary hearing was held. At the hearing on the motion to suppress, Corporal David Green, assigned to the narcotics and dangerous drugs detail of the Montgomery Police Department, testified that, at approximately 12:05 A.M. on July 22, 1977, he received a police radio *Page 1143 
dispatch instructing him to return a telephone call. Green, after making the telephone call, was informed that Mike Martis, Debbie Spann and the appellant were in possession of cocaine at the Cloverdale Grill on Cloverdale Road, Montgomery, Alabama. The informer stated that the three were driving a yellow, two-door Chevelle with Alabama license plate number BEA-329.
Green said the informant had personally seen the three in possession of the cocaine within twenty-four hours prior to Green receiving the information. Green stated that he knew the three individuals alleged to be in possession of the cocaine. Further, Green testified that he knew the informant and had received, on previous occasions, reliable information leading to several narcotic convictions.
According to Green, he then drove to the Cloverdale Grill where he discovered an automobile matching the description given to him by the informant. Green radioed for a "black and white police unit" to assist him. Green stated that they waited for "about fifteen minutes" before the three individuals came out of the grill and got into the yellow Chevelle. Further, Green testified that about two or three minutes elapsed between the time the three got into the automobile and the time they drove away.
Green and his partner, Officer Laing, proceeded onto Cloverdale Road in their unmarked police car, with the "black and white police unit" following them. The uniformed police unit stopped the Chevelle west of the intersection of Cloverdale Road and Felder Avenue. At that point, one of the uniformed officers conducted a weapons' search of the individuals, and a white envelope found on the street, several yards from the scene of the stop, was given to Green. Green found four small bags of white crystalline powder inside the envelope. All three suspects were placed under arrest for possession of cocaine and were taken to police headquarters. Also, at that time, the three individuals were informed of their constitutional rights.
Green testified that, at police headquarters, he performed a cobalt thicyanate field test on the seized white crystalline powder. The results indicated the presence of cocaine.
During cross-examination, Green acknowledged that the informer had given information on more than twenty previous occasions, but Green could remember the names of only two individuals who had been convicted.
Green stated that the cocaine had been shown to the informer and had been represented to be cocaine by the appellant and his two companions. Green added that they were trying to sell "some of it" to the informant.
Montgomery Police Officer Travis A. Hudson testified that he was riding in the front passenger seat of the "black and white police unit" which assisted in arresting appellant and his companions. According to Hudson, all three suspects were sitting in the front seat with the girl sitting in the middle. The appellant was sitting on the passenger side of the car. Hudson testified that he observed "an arm come out the right passenger side window — a big arm — that was a male arm." Hudson said that the car was almost stopped when the white envelope was thrown from the passenger side of the car. Further, Hudson stated that, when the car was stopped, he saw Mike Martis in the driver's seat, Debbie Spann sitting in the middle of the front seat, and the appellant sitting in the front, passenger seat. Hudson recalled that he observed Officer Taylor "frisk" the appellant and take two syringes from his left front pants pocket.
At the end of Hudson's testimony the court overruled the motion to suppress and the jury was selected from the venire.
After opening instructions from the court, the jury was returned to the jury room. One of the twelve jurors requested to speak with the trial judge. The juror, Linda Lushington, a nurse, told the judge that she remembered, after being seated as a juror, that the defendant's mother had been a past patient of hers. Further, she *Page 1144 
stated, "it's possible that . . ." her nurse-patient relationship with the defendant's mother would affect her ability to render a fair and impartial verdict in the case. At that point, the court declared a mistrial and instructed that a new jury be chosen from the same venire. Further, the court said that Mrs. Lushington's name was to be removed from the venire list before the second jury was chosen.
The defense counsel objected, stating "If a mistrial is declared you can't require the defendant or either side to strike from a jury that has already been stricken from because your other side knows who you are going to strike and who you are not going to strike and you can't get a fair and impartial jury that way."
The trial court overruled the defense's objection and denied his request for a continuance. The court noted:
 "One of the jurors after the jury was in the box remembered that she knew someone involved in this case that would in some way affect her ability to render a fair, just and impartial verdict and the court for that reason has declared a mistrial and we are about to strike this jury again and the defense takes an exception to that and the exception is hereby noted."
During the selection of the second jury, the State, prior to striking, represented that it would strike the same veniremen who were stricken before the mistrial was declared. After the State had made precisely the same strikes that it had previously made, the defense attorney renewed his objection and, from aught it appears, made the same strikes that he had previously made. The defense attorney again objected, stating "that we feel that it will not be satisfactory for the defendant to strike from the same jury under any circumstances, manner, shape or form." Further, the defense attorney said: "the reason for that is because it is . . . known by the jury; the jurors left off, they knew they were left off." At this point, the defense counsel's objection was noted and the new jury was seated and the trial began.
Officer Travis Hudson was called as the first witness, and he gave substantially the same testimony that he had given at the suppression hearing.
Montgomery Police Officer J.G. Laing, assigned to narcotics and dangerous drugs detail, testified that, around midnight on the night in question, he was working with Corporal Green near the Cloverdale Grill in Montgomery, Alabama. According to Laing, they were conducting a surveillance of a yellow Chevelle with an Alabama license plate containing number "BEA." Laing said they observed the vehicle for about forty-five minutes and that they were being assisted in the surveillance by a "patrol unit." During the surveillance and subsequent pursuit of the appellant's car, Laing was seated on the front passenger side of the unmarked police unit. He stated that the unmarked vehicle pulled alongside appellant's car and from his position he could view the suspect's car from the driver's side only. He testified that, during that period, he did not observe anything thrown from the passenger's side of the suspect's vehicle.
Laing stated that after he pointed his gun at the driver, Mike Martis, the suspect-vehicle stopped, and the three were subsequently arrested. Officer Laing's testimony about events leading up to and surrounding the arrest of the appellant and the two others substantially corroborated the testimony of Officer Hudson.
Corporal David Green's testimony was substantially the same as his testimony at the suppression hearing and corroborated that of Officers Hudson and Laing. Green stated that he was the evidence officer on the arrest scene and that he took possession of all evidence later delivered to the State Toxicologist, Alan Adair.
During cross-examination, Green admitted that he had known of the Oasis Massage Parlor for over a year. He acknowledged that he had been there on many occasions and that he had been acquainted with Ortega, the manager of the Oasis Massage Parlor, for about a year. He denied that she was his girlfriend. *Page 1145 
Alan Adair, a criminalist with the State Department of Toxicology and Criminal Investigation, testified that, on July 22, 1977, he received several small bags of "white, crystalline powder" from Green. Analysis of the powder showed that it contained cocaine. The two syringes which were turned over to Adair by Officer Green revealed no traces of controlled substances. All of this evidence was returned to Green by Adair on July 29, 1977.
Green was recalled to the stand by the State for the purpose of establishing chain of custody of the seized evidence. Defense counsel waived objection to the chain of custody and stipulated its propriety. However, he reserved any other objections to the admissibility of the evidence. State's Exhibit No. 1, containing the cocaine packets, was received into evidence over defense's objections.
From the record we find that certain extraneous evidence was inadvertently included in the plastic bag marked State's Exhibit No. 1. The trial court noted that this evidence had not been shown or exhibited before the jury. While the jury was absent, the court ordered the extraneous items removed from the bag. Afterwards, the two syringes recovered from the appellant were introduced into evidence.
At the conclusion of Green's testimony, the State rested its case. Defense counsel moved for a "directed verdict" which was subsequently overruled.
At this point, defense counsel made an offer of proof relating to the testimony of Ti Ortega, Mike Martis and Debbie Spann. Martis and Spann were given cautionary instructions by the judge outside of the jury's presence. The instructions concerned the right of an individual under the Fifth and Fourteenth Amendments to refuse to testify. Martis, exercising his Fifth Amendment rights, refused to testify, but Debbie Spann subsequently testified before the jury.
Debbie Spann testified that she began working for Ti Ortega at the Oasis Massage Parlor in February, 1977. Spann met the appellant on July 4, 1977; she had been instructed to pick him up at the Sheraton Inn and to transport him to the Boomerang Lounge. Thereafter, Spann and the appellant began a love affair. According to Spann, when the appellant learned where she was employed he began to visit her daily at work.
On one occasion the appellant arrived when Spann was engaged in love-making with one of the customers, and the appellant physically abused her. It was during that incident that Ti Ortega had the appellant removed from the premises.
Spann recalled that Ti Ortega had said that the Oasis Massage Parlor was allowed by the police to operate in exchange for information on suspected drug users. Ortega told Spann that, if she wanted to maintain her income as well as her drug supply, she would have to help her [Ortega] set the appellant up for a drug bust.
On July 21, 1977, Spann saw Ortega purchase cocaine from Martis at Ortega's house. The appellant telephoned Spann and became very angry when he learned that she was located at Ortega's house. When the appellant arrived, he lectured Spann about the foolishness of her drug habit and her prostitution. According to Spann, the lecture was accompanied by physical abuse. Afterwards, the appellant and Martis left and drove to a bar where they spent the rest of the afternoon and early evening drinking.
According to Spann, she was given cocaine by Ortega to be placed in the appellant's pocket. Afterwards, Ortega could inform the police that the appellant had cocaine in his possession. Spann agreed to the plan and the meeting was to be at the Cloverdale Grill about midnight. When Spann arrived at the Cloverdale Grill, the appellant was extremely drunk and needed Martis to assist him in walking even a few feet. Spann testified that the three of them left about an hour later. She placed a small bag of cocaine and syringes in the front pocket of the appellant's pants while he stumbled across the street to the parked automobile. Spann stated that the appellant *Page 1146 
was so drunk that he was unable to protest her actions. Spann recalled that when Martis backed out and began driving down the street, blue lights appeared behind the car and the police, using loud speakers, told the suspects to stop. About the same time, Martis told her to throw the cocaine out of the window. Spann testified that immediately prior to stopping the car, she and Martis threw the cocaine out of the window on the passenger side of the automobile. According to Spann, the appellant never touched the cocaine except when she placed it in his pocket without his knowledge.
During cross-examination, Spann admitted that she had given three different versions of what had happened on the night of July 21, 1977. Spann added that Ortega had threatened to revoke her bond if Spann did not tell certain versions of what had occurred. Further, Spann stated that Ortega said Green would drop the charges against Spann if she testified in a specific manner. Spann acknowledged that Green, as a member of the Montgomery vice squad, would have numerous occasions in the course of his duties to inspect the premises of the Oasis Massage Parlor for violations. At that point, a statement given to Green by Spann and signed by her was received into evidence. In this statement, Spann stated that the appellant had purchased the cocaine from Martis.
Barbara Reeves testified that Ortega said she wanted to get rid of the appellant because he was trying to convince Spann to quit her job. Reeves stated that she learned Ortega planned to have the appellant set up for a drug arrest. According to Reeves, after the appellant was arrested, she remembered Ortega saying that she had done what she had wanted to do and that it had been easier than she thought it would be.
Larry Coker testified that he and Ti Ortega grew up on the same street and that he had gone to school with her. According to Coker, Ortega told him that, in order to keep her place of business open, she had to supply the police with information. Coker stated: "In order to keep her place of business open that she had to inform on somebody and this is what she told me that she had done. She got what she had done wanted." Further he testified that Ortega told him she had informed on the appellant. Coker further testified that he had overheard a conversation between Green and Ortega after the appellant's arrest in which Green expressed appreciation to Ortega for all she had done in connection with the arrest.
Richard Ervin was called to testify as to the results of an experiment performed at the insistence of the defense counsel. The experiment was performed at the scene of the arrest on the night prior to the trial. However, the testimony was not allowed by the court.
Ti Ortega was called by the court as a witness. She testified that she had operated the Oasis Massage Parlor in Montgomery for approximately one year. Ortega stated that she hired several women whose duties were to give massages. Ortega denied any knowledge on her part of the occurrence of any prostitution at the massage parlor. She also denied any knowledge of the presence of any narcotics. Ortega stated that she was acquainted with the appellant because of his relationship with Debbie Spann and his frequent visits to the Oasis. Ortega admitted making statements to the effect that the appellant had to go because Spann was paying more attention to him than to her work. Ortega stated that, in general, males loitering around the premises was bad for business.
According to Ortega, on the afternoon of July 21, 1977, the appellant and Mike Martis came to the Oasis. At that time, the appellant offered to sell cocaine to Ortega at a price of one-hundred dollars per gram. Ortega described the cocaine as white powder sealed in a clear plastic bag. She stated that she refused to buy the cocaine and that the appellant responded that he would hold it until later that night. According to Ortega, after work that night, she called the police to tell them that the appellant, Mike Martis and Debbie Spann were at the Cloverdale *Page 1147 
Grill in Martis' automobile and were in possession of cocaine.
On re-direct, Ortega testified that earlier in the day she had told Green about the appellant's possession of cocaine.
Ortega stated that she had given to the police information which had led directly to four heroin convictions. Ortega stated that other information supplied by her was being used in numerous investigations which had not yet resulted in arrests.
Ortega denied making statements to Barbara Reeves or to Larry Coker that she [Ortega] had set up the appellant to get him out of the way and to satisfy her obligations to furnish information to the police. Ortega denied telling Spann, prior to her testimony at that trial, that she intended to go into court and admit that she "set up" the appellant. Ortega stated that she had been paid by the police for information given to them. For the case involving the appellant, she recalled receiving about fifty dollars.
Green was recalled to the stand and testified that, on the occasion in question, he gave Ortega ten dollars to cover her gasoline expense.
Spann was then recalled to the stand and testified that Ortega injected herself and Spann at least twice a week with narcotics at the massage parlor. Spann stated that Ortega knew that syringes were normally kept on hand at the massage parlor. Spann further stated that Ortega had several regular customers with whom she had sexual intercourse at the massage parlor. Spann testified that, as a condition of her bail bond, she was to continue to work for Ortega after the appellant's arrest.
The appellant took the stand and testified that he first met Debbie Spann in June 1977 and that "we sort of fell in love." According to appellant, Spann was working in the Oasis Massage Parlor but he was unaware that part of her duties included prostitution. He learned of the prostitution after a few visits to the parlor. According to the appellant, he overheard some "telltale signs" from the room occupied by a customer and Spann. He stated that he tried to convince Spann that she did not have to live in that manner and that she should quit working for Ortega.
The appellant learned in mid July that Spann had continued to engage in prostitution. He stated that a quarrel with Spann resulted in him telling her to move out of the apartment. He added, however, that the next day all was forgiven.
On the afternoon of July 21, 1977, the appellant called the Oasis trying to locate Spann. He stated that, when Spann refused to leave, he went with Mike Martis to a bar to get drunk. The appellant denied offering to sell cocaine to Ortega that afternoon.
Appellant testified that he and Mike Martis arrived at the Cloverdale Grill about 10:00 P.M., after consuming a substantial amount of liquor at another bar. According to the appellant, he had previously arranged to meet Spann at the Cloverdale Grill after she finished work at midnight. Appellant said that he could not remember leaving the Cloverdale Grill, but he recalled being arrested by the Montgomery police officers. He also denied knowledge of any drugs in Martis' automobile. According to the appellant, he never threw any cocaine out of the window of the automobile, and he denied ever seeing the syringes marked as State's Exhibit No. 2.
After the defense rested its case, the State called David West as a rebuttal witness.
David West testified that he was at the Oasis Massage Parlor on July 21, 1977. He recalled seeing the appellant, Mike Martis, Ortega and several others at the parlor during the day. West testified that, in the bathroom at the massage parlor, he saw some narcotics which he described as "crystal meth and marijuana and cocaine." West stated that the appellant did not say anything about the drugs. West acknowledged that no one was exercising any control over the drugs.
The jury was excused, and the State explained that West was supposed to have *Page 1148 
witnessed the appellant's attempt to sell the cocaine to Ortega. The court then made inquiry of West, and he denied seeing any alleged offer to sell cocaine by the appellant. At that point, the jury was returned and the witness was excused.
Carol Holley was recalled as a rebuttal witness. She testified that she was employed at the Oasis Massage Parlor on July 21, 1977. The witness stated that, on that date, she witnessed the appellant's attempt to sell cocaine to Ortega. Holley explained that the transaction occurred in one of the massage rooms. Further, she said that David West was not present at that time.
At the end of Holley's testimony, the State rested its case and David West was recalled to the stand by the defense. West testified that he did not overhear or see any attempted sale of cocaine by the appellant to Ortega. West stated that, if the attempted sale had occurred in another room, he would have overheard it because the walls were very thin.
Barbara Reeves was also recalled by the defense and she testified that she witnessed Ortega and Debbie Spann with narcotics as many as two or three times a day while she [Reeves] was working at the Oasis Massage Parlor.
At the conclusion of all testimony, the defense counsel renewed his motion for a "directed verdict." The motion was subsequently denied by the trial judge.
 I
The appellant complains that his motion to suppress the evidence should have been granted. In support of that contention, the appellant argues the same points which he presented on his motion to suppress. The points are substantially as follows:
(1) There was no probable cause to stop the appellant, (2) there was no warrant of arrest or search warrant obtained prior to stopping the appellant, (3) the plain view doctrine was inapplicable because the officers did not possess sufficient knowledge that the object found at the scene was, in fact, contraband, (4) the reliability of the informant was not shown, and (5) the search of the appellant at the scene of arrest was improper.
The Supreme Court of the United States in Brinegar v. UnitedStates, 338 U.S. 160, 69 S.Ct. 1302, 93 L. Ed. 1879, made the following observations regarding probable cause.
There the court said:
 "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . "`The substance of all the definitions' of probable cause `is a reasonable ground for belief of guilt.' . . . And this `means less than evidence which would justify condemnation' or conviction, as Marshall, C.J., said for the Court more than a century ago in Locke v. United States, 7 Cranch 339, 348, 3 L.Ed. 364."
In Brinegar, supra, the Supreme Court stated that:
 "Probable cause exists where `the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." [Citations omitted].
Whether one is concerned with probable cause to arrest or probable cause to search, the amount of evidence required is generally the same. In Braxton v. State, Ala.Cr.App.,350 So.2d 753, this court recognized the basis for determining whether probable cause to arrest existed. There this court said:
 "In determining whether there was probable cause to arrest, it is not necessary that the officer have before him evidence which would support a conviction for the offense. He must have facts and circumstances within his knowledge which are reasonably trustworthy and which would lead a prudent man to believe that the *Page 1149 
suspect had committed or was committing an offense."
In the present case, probable cause was sufficiently shown. Officer Green had been informed that the appellant and his companions, Spann and Martis, were at the Cloverdale Grill and were in possession of cocaine. Further, Green was told by the informant that she had personally seen the cocaine and that the white crystalline substance had been represented to her as being cocaine. Green testified that he knew the informant to be reliable and that, in the past, she had given him information which led to two convictions. Also, the automobile driven by Martis fit the description given to the officer by the informant. Additionally, Green knew the appellant, Spann and Martis and recognized them when they left the Cloverdale Grill. Green stated also that he knew Martis to be a drug user.
Therefore, it is clear that the officers had probable cause to arrest the appellant without a warrant based on the circumstances and information available to them at the time. See § 15-10-3, Code of Alabama 1975.
The two syringes found in the appellant's pocket as a result of the "pat down frisk" for weapons was incident to the lawful arrest for the possession of cocaine. Chimel v. California,395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Under these circumstances a search warrant was not required and the syringes were properly admitted into evidence.
The packages of cocaine which were received into evidence as State's Exhibit No. 1 were not discovered as a result of the search. They were found lying on the street after Officer Hudson said that he had seen something thrown from the passenger's side of the car in which appellant was riding. Under these circumstances, the packages of cocaine were properly admitted.
Regarding appellant's insistence that the police officer was not able to recognize the substance, the testimony at the suppression hearing indicated Officer Green was told by the informer that the appellant was in possession of cocaine, and Green stated: "In my own mind I knew it was cocaine." Therefore, it is our judgment that the packets retrieved by Officer Taylor and ultimately turned over to Corporal Green came within the plain view doctrine. See Coolidge v. NewHampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; Shipmanv. State, 51 Ala. App. 80, 282 So.2d 696.
The appellant has also questioned the reliability of the informant. He argues that the information came from an informant whose "reliability was questionable." That the informant was alleged to have run a massage parlor and was alleged to have had illicit affairs with different men would not be a guidance in determining her reliability as an informant. The test is whether the information she had given to the officers on previous occasions was in fact accurate and reliable. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329,3 L.Ed.2d 327. Under these facts recited above, we find that she had, on approximately twenty occasions, given information which led to convictions in two cases. Further, information which she relayed to Corporal Green was tested in the instant case and the accuracy of the information was shown to be true in every detail. Consequently, we are of the opinion that the informant's reliability was sufficiently shown to justify reasonable men in believing that the cocaine was in the Chevelle occupied by the appellant. Clenny v. State, 281 Ala. 9, 198 So.2d 293.
Therefore, it is the judgment of this court that, based on the circumstances and on the information available to the officers at the time, there was probable cause to search the vehicle in which the appellant was riding and to arrest the occupants without a search warrant. Under these circumstances, the trial court properly overruled the appellant's motion to suppress the evidence. See Daniels v. State, 290 Ala. 316,276 So.2d 441.
 II
The appellant asserts that, after a mistrial had been declared, it was error for *Page 1150 
the trial judge to compel the appellant to strike a second jury from the same venire. He argues that this procedure prevented him from obtaining a fair trial because the State knew which jurors he would strike during the second selection process. The appellant maintains that the State was given an unfair and improper tactical advantage.
This court, in Owens v. State, 51 Ala. App. 50, 282 So.2d 402, had before it a similar issue although the case was reversed on other grounds. The court held that the trial court did not abuse its discretion when it required the accused to strike a second jury from the same venire from which the first jury had been struck. In Owens, the appellant argued that the trial court's action placed him at a disadvantage because the State knew whom he had struck in the previous jury and had an advantage in striking the second jury. This court, in Owens, recognized the situation which had been created and stated: "This is true, but the state suffered in kind and degree." See also, Avery v. State, Ala.Cr.App., 363 So.2d 1036.
In the present case, as the facts recited above show, the State agreed to strike the same veniremen who had been struck by it in the previous selection process. Therefore, any advantage which existed would inure to the benefit of the appellant. Although we do not believe that the trial court's requirement to strike from the same venire was prejudicial to the appellant, we hasten to comment that the preferred procedure would have been to return the veniremen to the jury box and to draw a new group of veniremen from which the second jury could have been chosen.
See also Dunaway v. State, 291 Ala. 93, 278 So.2d 205. As inDunaway, the second jury, in the present case, was selected from the same venire before any evidence had been presented to the first jury.
 III
The appellant contends that the trial judge should have allowed into evidence a letter written by Debbie Spann to the appellant. In that letter, Spann detailed how she and Ortega contrived appellant's arrest.
In McElroy's Alabama Evidence, § 177.01 (2) (3rd Ed. 1975), we find:
 "As a general rule, the impeachment of a witness by the introduction of evidence that he has made a statement which is inconsistent with this testimony does not authorize the proponent of the witness to support his credibility by evidence that the witness has made a statement on another occasion of the same tenor as his present testimony."
See also, the cases cited therein.
Under the circumstances we find no error in the trial judge's refusal to admit the letter.
 IV
The appellant insists that the trial court was in error when it refused to allow Richard Irving's testimony regarding an out-of-court experiment conducted at defense counsel's instigation. In defense counsel's offer of proof concerning the experiment, counsel stated that Irving would have testified that he observed, on the night prior to trial, defense counsel and his daughter, who is about the same size as Spann, in an automobile. They were observed at the same location of appellant's arrest and during the same hour. Defense stated that Irving would have testified that, from his vantage point behind defense counsel's automobile, it was not possible to determine whether defense counsel and daughter switched places or whether a male or female arm appeared out of the window on the passenger's side.
The court in Madden v. State, 40 Ala. App. 271, 112 So.2d 796, stated:
 Out of court experiments are admissible where there is substantial similarity between the essential conditions of the experiment and of the occurrence, and much is left to the discretion of the trial court
in determining these similarities."
[Citations omitted.]
In the present case, the record indicates the trial judge's reservation regarding *Page 1151 
the similarity between the experiment and the occurrence. Further, no predicate for the admission of the experiment was shown. Therefore it is our judgment that the trial court was acting within its sound discretion in refusing to allow the evidence of the out-of-court experiment.
 V
Appellant maintains that the trial judge was in error when he did not allow Debbie Spann to testify that Ti Ortega said, in the hallway outside the courtroom during the trial, that she [Ti Ortega] intended to testify to contriving the appellant's arrest.
A witness may not ordinarily testify to acts or statements made by a third party which occur outside the presence or hearing of the defendant. Frazier v. State, 48 Ala. App. 210,263 So.2d 511.
Clearly, the trial judge was correct in sustaining the State's objection to defense counsel's attempt to elicit hearsay testimony.
 VI
Finally, the appellant contends that the trial judge committed reversible error when he refused to give certain written requested instructions.
The record indicates that the trial judge gave several of appellant's written requested charges to the jury, with the instruction that the charges were correct statements of law entitled to the same weight given to the court's oral charge. In our judgment the refused charges were fairly and adequately covered by the oral charge. Section 12-16-13, Code of Alabama 1975; Ingram v. State, Ala.Cr.App., 356 So.2d 761.
 VII
The evidence presented by the State indicated a prime example of a probable cause situation, and the evidence was properly received by the court.
Further, the State presented legal evidence from which a jury could by fair inference find the defendant guilty. Haggler v.State, 49 Ala. App. 259, 270 So.2d 690.
We have searched the record and find no error prejudicial to this appellant; therefore, the judgment of conviction by the Montgomery Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.